[Cite as *State v. Robinson*, 2012-Ohio-1686.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 10 MA 128 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| AARON ROBINSON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:          Criminal Appeal from Common Pleas
                                   Court, Case No. 09 CR 616.

JUDGMENT:                          Convictions Affirmed.  Sentence
                                   Reversed and Remanded for
                                   Resentencing.

APPEARANCES:
For Plaintiff-Appellee:            Attorney Paul J. Gains
                                   Prosecuting Attorney
                                   Attorney Ralph M. Rivera
                                   Assistant Prosecuting Attorney
                                   21 W. Boardman St., 6th Floor
                                   Youngstown, OH  44503

For Defendant-Appellant:           Attorney J. Dean Carro
                                   University of Akron School of Law
                                   Legal Clinic – Appellate Review Office
                                   Akron, OH 44325-2901

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated:  March 27, 2012

DeGenaro, J.

{¶1} Defendant-Appellant, Aaron Robinson, appeals the decision of the Mahoning County Court of Common Pleas convicting him of rape and sexual battery, and sentencing him accordingly. Robinson raises four arguments; first, the State presented insufficient evidence that he knew or had reason to believe that the victim was substantially impaired due to voluntary intoxication. Second, his convictions were against the manifest weight of the evidence. Third, because rape and sexual battery are allied offenses of similar import, the trial court erred in sentencing him to concurrent terms of incarceration. Finally, the trial court failed to properly inform him of the consequences of violating the terms of his post-release control during the sentencing hearing and in its sentencing entry.

{¶2} Robinson's arguments are meritless in part and meritorious in part. The State presented sufficient evidence that Robinson knew of D.K.'s substantial impairment, and his convictions were not against the manifest weight of the evidence; it was reasonable for the jury to find Robinson's claims to not be credible and believe the testimony of other witnesses. However, since the trial court merged Robinson's offenses, it erred by imposing concurrent sentences upon him, and also by failing to properly instruct Robinson on the consequences of violating the terms of his post-release control. Accordingly, Robinson's convictions are affirmed, his sentence is reversed, and this cause is remanded for a new sentencing hearing during which the State will elect which merged offense to pursue for sentencing purposes and for resentencing pursuant to R.C. 2929.191.

### Facts and Procedural History

{¶3} On June 11, 2009, Robinson was indicted by the Mahoning County Grand Jury for one count of sexual battery (R.C. 2907.03(A)(2)(B)), a third-degree felony; and two counts of rape: one alleging rape where the victim's ability to consent is substantially impaired (R.C. 2907.02(A)(1)(c)(B)), a first-degree felony; and, the other alleging rape by force or threat of force (R.C. 2907.02(A)(2)(B)), a first-degree felony.

{¶4} On June 21, 2010, the matter came before the court for a jury trial. The parties agreed upon the following facts and proposed joint stipulation to be read to the jury during the trial:

{¶5}   "Ladies and gentlemen of the jury, the State and defense have agreed upon the following stipulation of fact, which is an agreement that you may accept as a fact in this case.

{¶6}   "The DNA of the Defendant, Aaron Robinson, was found in the form of semen in the vagina and genital region of the alleged victim, Ms. [D.K.]."

{¶7}   The State called D.K. as its first witness.  She testified that she is 20 years old.  On April 13, 2009, around midday, she was with her son and Alex Dorsey, her best friend, at her mother's house in Alliance.  She stated that she has never been romantically involved with Dorsey.

{¶8}   She testified that around 3:45 p.m., she and Dorsey left Alliance and drove to her friend Amber Kenst's house in Sebring to pick her up and take her to work.  D.K. explained that Kenst had gotten in trouble the night before and lost her license.  She and Dorsey took Kenst to her workplace in Alliance.  They then decided to get a bottle of 110 proof vodka to surprise Kenst with after work, and returned to Kenst's house, with her permission.

{¶9}   D.K. explained that on the way back to Kenst's house, they saw Robinson walking down Ohio Avenue, who she knew from school and that they had been, but were no longer friends.  She pulled over and asked him if he could buy her a bag of marijuana, so that she, Kenst and Dorsey could smoke it that night.  Robinson indicated that he could find marijuana for her, and when she told him they were going to Kenst's house, he said he would be there.

{¶10}  D.K. and Dorsey then went to Kenst's house and had approximately two shots.  Robinson arrived about 15 minutes later with marijuana, and at this point she thought that the three of them smoked a joint.  She had approximately one or two more shots after Robinson arrived, and she had about five shots total.

{¶11}  She explained that after she paid for the marijuana, Robinson gave her a pill, which she thought was Xanax.  He asked her if she wanted the pill, but she acknowledged that she took it of her own free will.  She described the pill as white, round, and small.  She also testified that she is familiar with Xanax and has taken it before.  However, she said that she was not paying attention to whether there were any markings on the pill and she agreed that she assumed it was a Xanax, but she had no idea what

she took. She explained that after she took the pill, she had one or two more shots.

{¶12} D.K. stated that they sat down and talked and she felt a little woozy. She went outside and smoked a cigarette, and then came back inside. At one point she got up to use the bathroom and she felt really intoxicated. She testified that this was around 6:00 or 6:30 p.m. She stated that she remembered walking down the steps to the bathroom in the basement, and then she did not remember anything else about the night. She did not remember leaving the residence at any point that night; however, the following day, she found food wrappers and soda bottles in her vehicle that were not there before. Based on that, she thought that she went to Circle K, a convenient store, that evening.

{¶13} D.K. testified that the next thing she remembers is waking up in the hospital at approximately 8:00 a.m. She stated that she was still a little intoxicated at that point. Officer Lowman told her that the police found her half naked in the basement and that they were going to give her a rape kit, if possible. A nurse gave her a sexual assault exam during which the nurse took a swab of her vagina. D.K. testified that she was menstruating and during the examination, the nurse found a tampon deep inside her vagina. She stated that she had been sexually active since she was 18 and had never had sex with a tampon in before. She also testified that she would not engage in any sexual act with Robinson because she has always found him unattractive and it had never occurred to her to do so.

{¶14} On cross, D.K. testified that she had recently broken up with her boyfriend and that she needed a night of partying to forget about her problems. She testified that she had partied with Robinson and purchased marijuana from him before. She stated that the shots of vodka she had were single shots. She also agreed that nobody forced her to smoke marijuana that night and she had smoked it before, and that she has "a little bit" of experience with drinking.

{¶15} D.K. testified that it was cold when she went outside to smoke a cigarette, and she agreed that the air sobered her up a little bit. She also agreed that she had planned her drinking and drug consumption because she wanted to be sober when Kenst returned. She testified that when she went back inside, she had a couple more shots. When asked if she felt good enough to drink more at that point, she replied, no, it was

more like Dorsey encouraged her to have a shot, but she agreed that she chose to.

{¶16} D.K. agreed that when the doctors in the ER asked if she was sexually assaulted, she told them no because she had no reason to believe that she was raped. She had told the nurse at 7:45 a.m. that she remembered nothing about the night before and when she said this, her father was in the room and he had been talking to her. She agreed that at 8:55 a.m., the nurse came back and she remembered that she had done shots. She confirmed that she had no injuries on her body and was not in any pain besides the catheter. D.K. testified that she had put a tampon in that evening before she arrived at Kenst's house because she was due to start menstruating, and did not remember removing it that evening. She explained that the nurse did not find the tampon when she inserted a catheter but discovered it later while performing the pelvic exam. D.K. agreed that it was possible that the hospital pushed the tampon up.

{¶17} On cross-examination, D.K. agreed that she trusts Dorsey and that when he and Robinson helped her from the vehicle into Kenst's house, he was likely trying to help her. She testified that he would never do anything to hurt her and would not let anyone else hurt her. D.K. testified that her son was not in the car that night when she took Kenst to work. She also confirmed that although she was drinking vodka and smoking marijuana that night, she was not charged with anything. D.K. agreed that on April 17, Detective Lowman took a video interview.

{¶18} On redirect, D.K. stated that she was aware that when she was at the hospital over 12 hours after the incident, her blood alcohol content was still .170, which is over eight times the legal limit for someone her age. She also agreed that she told the SANE nurse that she was not sexually assaulted because she did not remember what happened after around 6:00 p.m.

{¶19} The State then played its Exhibit 13, the video interview of D.K., under the prior consistent statement exception to the hearsay rule for the jury. When counsel asked about her description on the video of the pill she received from Robinson as a pink, round pill, D.K. said that she had blocked it out of her mind.

{¶20} Next, the State called Theresa Christy. Christy testified that she lives in a house 50 or 55 feet behind Kenst's, and that Kenst rented the house from Christy's parents. Christy also testified that she does not know Robinson or D.K..

{¶21} On the evening of April 13, 2009 around 9:00 or 9:30 p.m., Christy was in her kitchen doing housework. She said that the lighting at the time was great and explained that she has sensor lights on her deck which were on; the porch light at Kenst's house was on; and there is a streetlight nearby. She agreed that she had a pretty good view of everything from her house. She stated that she heard male voices and car doors, and she looked out her window because she keeps an eye on the house. She did not hear a female voice. She observed two males get a female out of the front seat of the vehicle and explained that they "literally drug her, you know, one on each side, to the house and up and in." She further explained:

{¶22} "[T]hey just took her out of the front seat, and after they got her out, there was one on each side, and they kind of – I mean, her head was hanging down and her feet were just dragging. I mean, she wasn't very big anyway, and they just literally drug her like a rag doll." Christy agreed that it appeared that the female was unconscious.

{¶23} Christy explained that the distance from the parked car into Kenst's house was about 25 or 30 feet. The two males were on each side of the female and were holding her up and walking with her like how somebody helps a football player off the field. Christy stated that she did not see the female make any movements and her toes were dragging on the ground. Christy further explained that the males carried her up three steps onto the porch and into the house.

{¶24} When asked about a physical description of the males, Christy testified that both were Caucasian; one was medium built and the other was much smaller.

{¶25} Christy testified that she was concerned for the female, so she called her parents and they told her to call the police, which she did. She estimated that five minutes passed from the time she first saw the female carried into the house until she was on the phone with the police. She explained that police and an ambulance arrived. Approximately 30 or 45 minutes after she observed the female being carried into the house, the paramedics brought her out on a gurney. Finally, Christy explained that she knew Dorsey as Kenst's friend, but she did not know he was there before he was brought out of the house and otherwise, she does not know anyone in regards to the case.

{¶26} On cross, Christy admitted that she could not identify Robinson as one of the two males she saw that night. Christy clarified that she called the local authorities, not

911. She did not call an ambulance and she stated that she had no reason to call one; she just knew that the female looked unconscious and she thought they were drunk. She also acknowledged that she called her father because he owns the house and she wanted to make sure no damage was done to it. She knew that Kenst was not at home. She acknowledged that when she called the authorities, she asked them to send someone to check it out, which does not sound very emergent.

**{¶27}** Christy admitted she did not mention the female looked like a rag doll when she called the police. She agreed that during her call, she said that they were "kind of dragging a girl into that house," but she had testified that they were literally dragging her. However, Christy stated that the female did look like a rag doll being dragged and she did not agree that she had expanded her original statement to the authorities.

**{¶28}** Christy testified that after she called the police, she saw a male leave the house and head west. She stated that she was certain he was one of the males dragging the female into the house and that he was the smaller man. The police arrived immediately after he left, and she did not see him return to the house.

**{¶29}** The State called Detective Lowman as its next witness. Detective Lowman testified that he had been a juvenile detective with the Sebring Police Department for approximately ten years and he had been in law enforcement for 26 years. He explained that his expertise is in dealing with sexual assaults and he has between 100 and 150 hours of training in the investigation of sexual assaults of juveniles and adults.

**{¶30}** On April 13, 2009, Detective Lowman was working in uniform around 9:30 p.m. He was dispatched to 146 North 19th Street after dispatch received a call where the complainant observed two males dragging a female into the property; according to the complainant, all three appeared to be intoxicated and the female appeared to be passed out. Detective Lowman further testified that calls to the Sebring Police Department are recorded and kept as public records. He then identified State's Exhibit 8 as the 911 audio CD from the station's radio call log and Exhibit 9 as the computer generated typewritten radio and telephone log that the dispatchers create. He stated that Exhibit 9 shows that dispatch received the call from Christy at 9:32 p.m. At 9:37 p.m., Detective Lowman arrived in the area of the call.

**{¶31}** Detective Lowman testified that as he pulled up to the driveway, he

observed a vehicle in the driveway and saw that the house was dark except for a light coming from a basement window. He ran the license plate through the LEADS computer and determined that the vehicle belonged to D.K. Detective Lowman explained that he knows D.K. because as a juvenile officer, he would go to the schools and interact with the children. He further explained that he knows Dorsey and Robinson in this same capacity. However, other than his relationship with D.K. as a juvenile officer, he has no other ties to her.

**{¶32}** He explained that after he ran the license plate, he spoke with Christy. She told him that she observed two males drag a female into the residence, that the female appeared to be passed out, and that all three appeared to be intoxicated. He confirmed that the distance between Christy's house and Kenst's house is between 50 and 75 feet and he agreed that the area was lit fairly well.

**{¶33}** Detective Lowman confirmed that Exhibit 9 shows that Christy's father arrived at 9:45 p.m. and they approached the door of the house. Detective Lowman knocked and announced twice and heard a shuffling noise like someone fell or knocked something over. The door finally opened, and he saw Dorsey on his hands and knees appearing extremely intoxicated. Detective Lowman asked him to get up and allow him entrance, but Dorsey attempted to shut the door. Detective Lowman placed his foot in the door to keep it ajar, and he pushed on the door for a while before Dorsey retreated. Christy's father stepped off the porch, and Detective Lowman entered the house. He located Dorsey in a bedroom closet, and when Dorsey refused to exit the closet, Detective Lowman called for backup. He explained that Officer Johnson responded first at 9:52 p.m., and then Officer Karafa arrived at 9:56 p.m., according to the log.

**{¶34}** Detective Lowman explained that he and Officer Johnson removed Dorsey from the closet and placed him in custody for underage consumption. Detective Lowman testified that he then searched the rest of the main floor for the other individuals, and then went to the basement. In the basement, he observed Robinson and D.K. lying on a makeshift bed composed of a blanket on the concrete floor and pillows set up against the wall. He testified that they appeared to be asleep and had a blanket over top of them. He confirmed that he recognized D.K. and Robinson at that point.

**{¶35}** Detective Lowman called out to wake up Robinson and D.K., but D.K. did

not respond at all. Robinson woke up, and Detective Lowman stated that he was not alert at first probably due to his sleepiness, but then later, he became alert enough that the officers could speak with him. Detective Lowman testified that D.K. was lying on her left side in a semi-fetal position. When he attempted to awaken her, he lifted off the blanket on top of her and discovered that she was wearing a top but was naked from the waist down. Her pants and underwear were on the other side of the blanket where Robinson was lying. Detective Lowman questioned why if D.K. had removed her own clothing, he found the clothing lying by Robinson on the other side of him rather than next to her.

{¶36} Detective Lowman testified that when D.K. did not respond to his voice command, he grabbed her by the shoulders and said "wake up, police officer, wake up, police officer." However, she did not respond at all; her eyes were semi-open and were starting to roll into the back of her head. When she did not wake up, the officers contacted the first responders. Upon their arrival, they performed a sternum rub, where the first responder rubs his or her knuckles vigorously across the person's sternum. Detective Lowman observed the sternum rub and stated that D.K. still did not respond.

{¶37} Detective Lowman testified that he gathered D.K.'s pants and underwear as potential evidence, and he observed that they were soiled by what he believed to be urination due to the odor and appearance. He explained that the clothes were wet in spots as though a female had wet her pants while wearing them. He agreed that urination on oneself is a sign of intoxication or severe impairment.

{¶38} Based on Exhibit 9, Detective Lowman testified that he sent a request for the first responders at 9:57 p.m. The officers also requested an ambulance at 9:58 p.m. Rescue squad one arrived on scene at 10:00 p.m. and rescue squad two arrived at 10:02 p.m. Detective Lowman estimated that six people were in the basement as D.K. was being treated. He explained that the first responders removed her on a cot, and he did not see her wake up at any point. The ambulance transported her to Alliance Community Hospital.

{¶39} Detective Lowman questioned Robinson at the station, and Robinson admitted that he had sexual intercourse with D.K. Detective Lowman testified that Robinson said the sex was consensual, although Detective Lowman did not believe him. He requested that Robinson put this information in a written statement, but Robinson

refused.

**{¶40}** Detective Lowman testified that he spoke with D.K. the following morning at the hospital at approximately 11:00 a.m. At this point, she was still intoxicated, with a blood alcohol content of .17. He testified that State's Exhibit 3, the rape kit, was sent to the Ohio Bureau of Criminal Investigation. When counsel asked whether he was aware that semen was identified in D.K.'s vagina and it was a match to Robinson, Detective Lowman replied that the semen was identified from D.K.'s rectum. The court sustained an objection by Robinson's counsel and instructed the jury to disregard the statement. The court stated that the parties stipulated that any semen found on the alleged victim was found in the vagina and any reference to the rectum was to be disregarded.

**{¶41}** The State then played State's Exhibit 8, the 911 audio recording, for the jury.

**{¶42}** On cross, Detective Lowman confirmed that during his interview with D.K., he spent the first several minutes explaining to her what he believed happened. He confirmed that he did not see any injuries on D.K.'s body. He agreed that consistent with the idea that she had been dragged into the house, she was also dragged down the 12 steps into the basement, not sustaining any injury.

**{¶43}** The State called Officer Greg Karafa as its next witness. Officer Karafa testified that he had been a patrolman with the Sebring Police Department for a year and a half and had been in law enforcement for approximately three and a half years. He had done alcohol detection/apprehension training, which is basic training to detect people under the influence, usually for driving offenses. He stated that he performed 40 OVI arrests in the last year. He also stated that he does undercover work for narcotics with a special investigative unit.

**{¶44}** Officer Karafa testified that when he first arrived on scene, Officer Johnson was detaining Dorsey upstairs and Detective Lowman was downstairs with D.K. and Robinson. Officer Johnson asked him to stay with Dorsey, which he did until Officer Johnson brought Robinson upstairs.

**{¶45}** Officer Karafa then went downstairs to assist Detective Lowman. He testified that D.K. "appeared lifeless." When asked if he thought she was dead when he first saw her, Officer Karafa replied that he had no idea and did not see any movement

from her. He tried to rouse her by standing at her feet and yelling at her, but she did not respond at all. He further testified that he also saw D.K. as the first responders were carrying her out of the basement and as she passed by, he saw no signs of life. When asked if D.K. exhibited any signs that caused him to think she may be intoxicated or impaired, Officer Karafa responded, "I had no idea what was going on at that point. I didn't have any indicators to say that she was." He agreed that he was currently aware that D.K. had been intoxicated. He said while working with narcotics and OVI arrests, he has encountered hundreds of intoxicated people. He testified that compared to those hundreds of people, D.K. was "[p]robably the top two worst I've ever seen." He had encountered one heroin overdose, and D.K.'s case was just as bad, if not worse than the overdose.

{¶46} On cross, Officer Karafa admitted that he never stated that D.K. appeared dead in his report, only that she appeared unconscious. He agreed that he could not say whether D.K. was conscious when she and Robinson had sex nor could he say whether she consented to sex with him.

{¶47} On redirect, Officer Karafa testified that based on what he observed, D.K. was not in a state to consent to anything.

{¶48} The State then called Officer Johnson of the Sebring Police Department. Officer Johnson testified that he is a patrolman and drug investigator. He had been a police officer for Sebring since November of 2002. He has training to perform standardized field sobriety tests, and he has experience with intoxicated individuals and has made multiple OVI arrests. Regarding April 13, 2009, he testified that when he encountered Dorsey, he appeared very intoxicated on either drugs or alcohol or both.

{¶49} After Officer Karafa arrived, Officer Johnson went to the basement to assist Detective Lowman who was there with Robinson and D.K. He described Robinson as groggy and perhaps intoxicated but stated that he was awake and Detective Lowman was talking to him. In regards to D.K.'s condition, he said that when he first saw her, he thought that she was possibly dead. He explained that "[h]er skin color was very, very gray, and I could see foam at her mouth as I got closer, and it actually made the hair stand up on the back of my neck when I saw her." He concluded that this was the highest level of intoxication he had ever witnessed. He explained that he was upstairs when the

first responders brought her out and her condition appeared the same at that point as it did in the basement.

**{¶50}** Officer Johnson testified that he later questioned Robinson after reading him his Miranda warnings. Robinson told him that he had sex with D.K. and that she had taken her pants off and wanted to have sex. However, Officer Johnson stated that based on what he observed, it did not appear that D.K. was capable of consenting to anything.

**{¶51}** On cross, Officer Johnson agreed that he did not know when Robinson and D.K. had sex. He also confirmed that he could not say when the drugs and alcohol put her into the state in which he found her. He agreed that when he encountered Dorsey, he was foaming at the mouth and he was transported to the hospital because of his level of intoxication.

**{¶52}** The State called Dianna Trussel as its next witness. Trussel stated that she is a registered emergency room nurse at Alliance Community Hospital and has worked as a registered nurse since 1976. She testified that she was working on April 13, 2009 at approximately 10:00 or 10:30 p.m., and she was one of the primary nurses who treated D.K. Counsel provided Trussel with State's Exhibit 12, the notes she took while treating D.K.

**{¶53}** Based on State's Exhibit 12, Trussel testified that her first encounter with D.K. was shortly after she arrived in the emergency room around 10:36 p.m. She had made a note at 11:06 p.m. that D.K. urinated over the side of the bed onto the floor and she inserted a catheter because D.K. was unable to control her bodily functions. She explained that she has inserted a large number of catheters during her career and has inserted a catheter in a woman who was using a tampon before. She stated that there was no way that she would have shoved D.K.'s tampon further inside her vagina as she inserted the catheter. She did not recall seeing a tampon or string and explained that generally she would be able to see the string when she inserted the catheter.

**{¶54}** Trussel noted that D.K.'s blood alcohol content around the time she was admitted to the hospital was .274. She stated that she has experience with intoxicated individuals and, in general, a .274 blood alcohol content is "fairly significant." However, she acknowledged that this depends on how much and often a person drinks. She explained: "I have seen .274s that if they are regular drinkers it's – it's just another day in

the neighborhood. It doesn't affect them at all. If they drink occasionally, they are – you can tell they are under the influence. But if they don't drink very much they are somnolent, highly intoxicated, passed out."

**{¶55}** Trussel testified that in regards to ordering a SANE exam, the doctor was waiting for D.K. to become more sober and cooperative so she could consent to the exam. She explained that she turned over D.K.'s care to the SANE nurse at approximately 8:00 a.m.

**{¶56}** On cross, Trussel testified that she did not see any physical injury on D.K., although she stated that she did not examine her entire body. Trussel agreed that sometimes objects get stuck inside the vagina during consensual sex; however, she saw no reason why a person would leave a tampon in during consensual sex. She also agreed that there was a triage note in D.K.'s chart, which gave her a 14 out of 15 Glascow rating, measuring how coherent a patient is when they first arrive at the hospital. She later explained on recross that a score of 14 indicated that she opened her eyes spontaneously to verbal stimuli, her verbal responses indicated she was confused, and that she followed motor commands. She further noted that D.K.'s file stated, "[p]atient admits to taking one Ecstasy."

**{¶57}** Counsel handed Trussel Defendant's Exhibit 3, the tox screen done on D.K.'s urine, which she said showed presumptive positive for THC, which is marijuana. Trussel explained that the only positive result was for THC, although she stated that it does not test for all drugs. Finally, she testified that there was no way to tell at what point in time D.K. became intoxicated.

**{¶58}** On redirect, Trussel testified that when she treated D.K., she appeared heavily intoxicated, and Trussel did not think that D.K. was able to control herself as a sober person would be able.

**{¶59}** The State then called Barbara Devies as its next witness. She testified that she is a registered nurse and she specializes as a sexual assault nurse examiner. She explained that SANE nurses are specially trained to take care of rape cases in the emergency room and administer the sexual assault exam. She became an RN in 1986 and she trained to become a SANE nurse in 2001. She estimated she has performed between 60 and 80 sexual assault examinations.

{¶60} On April 14, 2009, Devies performed the sexual assault examination on D.K. Counsel gave Devies State's Exhibit 14, and she identified it as the paperwork that accompanies the sexual assault exam, or rape kit. Devies stated that the report showed the time of the exam as 9:30 a.m. She explained that when she interviewed D.K., D.K. did not remember what had happened to her. She noted that D.K. told her that she did not take Ecstasy, only Xanax, although the notes said that she had taken Ecstasy.

{¶61} Devies explained that although D.K. told her she was not using a tampon, when Devies performed the pelvic exam, she discovered one. She noted on the report that D.K. had then told her that she had inserted a tampon the night before. She explained that she found the tampon by the cervix and estimated that it was in three or four inches. She stated that the tampon was jammed in there somehow and although she had never seen a tampon that high in the vaginal cavity, she had heard of it happening in the context of SANE exams and people having sex.

{¶62} Devies testified that she did not see any injuries on D.K., including her genital region. However, Devies explained that it is uncommon to find injury during a sexual assault exam. She further explained that if one were raped while unconscious, that person would not be able to fight back, making injury less likely.

{¶63} On cross, Devies agreed that she did not know when D.K. reached the level of intoxication she was in when she arrived at the ER and she could have reached that level of intoxication when she went to sleep. She also agreed that a patient cannot consent to an elective procedure like a SANE exam if they are at all not sober. She confirmed that D.K. could not tell her when she had sex and Devies could not tell the time she had sex from the physical examination. She also confirmed that she did not know whether the tampon was present during the sex act, she only knew that the tampon was impacted.

{¶64} On redirect, Devies testified that when she asked D.K. if she had engaged in consensual sex within the last 72 hours, D.K. said no; however, Devies agreed on recross that D.K. could not remember anything after approximately 6:00 p.m.

{¶65} The State then rested its case subject to admission of exhibits. The State submitted Exhibits 1, 2, 3, 8, and 9, which the court admitted without objection. The State withdrew all other exhibits that it offered.

{¶66} The defense then made an oral motion for a mistrial due to Detective Lowman's mention of anal penetration in violation of the earlier motion in limine. The court overruled the motion for mistrial, noting that it gave the jury a curative instruction immediately after the witness made the statement. The defense then moved for an acquittal on all three counts pursuant to Crim.R. 29. In regard to rape by intoxication and sexual battery, the defense argued that reasonable doubt exists because nobody could testify as to D.K.'s level of intoxication at the time of the sexual intercourse or whether D.K. consented to it. In response, the State argued that it presented evidence that D.K. was unconscious and that this issue should be submitted to the jury. The court then overruled defense's motion for acquittal.

{¶67} The defense then called Aaron Robinson as its only witness. Robinson testified that around 4:00 p.m. on April 13, 2009, he was walking to a friend's house when a vehicle pulled up with D.K., Dorsey, James, and D.K.'s son. He stated that he knew D.K. from school and partying and he had seen Dorsey at school. He explained that D.K. asked him if he wanted to come with them and smoke a blunt, and he said yes and got in the back seat of the vehicle. Robinson testified that he asked D.K. if they were going to go somewhere to smoke because her son was in the vehicle, but she told him to just roll the window down. He stated that they then drove around Sebring and smoked.

{¶68} Robinson testified that they dropped James off at his house, and then D.K. asked him if he wanted to have a good time and drink and hang out, and Robinson said yes. D.K. told him that first she had to drop her son off in Alliance. Robinson had her drop him off at his friend Brian's house and told her to meet him there later. Robinson went to acquire some marijuana for himself and then returned to Brian's house. Then he and Brian went to Circle K and he saw D.K. and Dorsey across the street at Pizza Joe's. At that point, Brian left and Robinson got in D.K.'s vehicle.

{¶69} Robinson testified that at that point it was around 5:00 or 5:30 p.m., and they drove around and smoked marijuana. D.K. then suggested they go to Kenst's house. Robinson explained that when they got there, they sat at the kitchen table and smoked and all three of them drank shots of vodka that D.K. supplied. He stated that he did not remember how many shots he took nor did he know how many shots D.K. took.

{¶70} Robinson testified that the three of them then drove around for ten or fifteen

minutes and smoked. He stated that D.K. drove, and he did not know what time it was, but it was in the evening and not dark yet. They returned to Kenst's house and hung out. Robinson stated that D.K. then drove the three of them around Sebring again. He said that they finished smoking and went through a drive-thru to purchase energy drinks. He testified that there was no reason for him to believe that D.K. was unable to drive. They then returned to Kenst's house.

**{¶71}** Robinson testified that they took more shots of vodka and finished the liter, but he did not know how many shots he had. D.K. told him that they were not supposed to be at Kenst's house, so they decided to go to D.K.'s house. However, when he and D.K. got in her car, Dorsey came out and talked to D.K. and convinced her to stay. Robinson testified that as they walked into the house, the three of them were walking in a line and D.K. and Dorsey were stumbling and holding onto each other. He stated that he was not touching D.K. at all as they walked. He explained that Dorsey had his arm around D.K., but she was walking on her own.

**{¶72}** Robinson testified that when they got in the house, Dorsey fell over in the kitchen and knocked over items next to the refrigerator. He stated that he and D.K. walked downstairs to the basement. He explained that he walked behind D.K. and was not helping her down the steps in any way. He testified that she was wobbling a little bit, but explained that they "had a buzz going so no one was perfectly walking straight." He further explained that she was talking to him and there was no reason for him to believe that she did not know what was going on at that time. He described the basement as having a sitting area with pillows.

**{¶73}** Robinson stated that D.K. went to the bathroom, and when she came out, she walked over and laid down on the pillows and blankets. Robinson testified that he told her that he was going to go home, and she asked him to stay with her. He laid down next to her. D.K. did not say anything at that time, but Robinson claimed that she started kissing him. He stated that there was no reason for him to believe that she did not know what was going on and he did not smell urine. He testified that D.K. started rubbing on him and grabbing him. She removed her pants and underwear in one motion and Robinson removed his own. He explained that D.K. put her pants at the end of the makeshift bed. He stated that they then had sexual intercourse.

{¶74} Robinson testified that after they had sex, they kissed and laid next to each other and he fell asleep. He said that before he went to sleep, D.K. was fine and did not appear to be in any distress. He smelled alcohol but not urine. He explained the next thing he knew, he heard "police," and woke up to Detective Lowman standing over him. He stated that he leaned over and shook D.K. and said, "Dawnna, the cops are here. Dawnna, the cops are here." He claimed that D.K. moaned in response like someone that did not want to be bothered.

{¶75} Detective Lowman handcuffed Robinson, and Officer Johnson brought him upstairs. He told the officers that he and D.K. had sex and that she removed her pants. He also told them that D.K. consented to the sex. Robinson agreed that he has had some "scrapes with the law."

{¶76} On cross, Robinson confirmed that he has been convicted of petty theft. When asked if any of the three officers involved in the instant case were involved in his theft conviction, he responded that a different officer served him the papers. Robinson confirmed that he and D.K. had sex in the evening, but he was not sure what time it was. He also confirmed that he was not wearing a condom, but he stated that he did not ejaculate inside D.K.. When asked if he was aware that his semen was found inside her vagina, he said that it was pre-ejaculate. When asked if he admits that when he was coming from the car with D.K., he was one of the two white males seen walking with her, he confirmed that he was one of the males walking with her.

{¶77} Robinson testified that D.K. had her own marijuana and he did not buy any for her, only for himself. He also denied that he gave D.K. a pill. He stated that he has taken pain relievers and downers, but he did not have any pills in his possession that night. He also admitted that he told the police that the three of them "killed a liter of 110-proof vodka."

{¶78} On redirect, Robinson testified that he did not see Dorsey or D.K. take any pills, although Dorsey told the police officers that they took Ecstasy.

{¶79} The defense then rested its case. The court admitted Defendant's Exhibits 1 and 3, and admitted Exhibit 4 over the State's objection. Regarding Exhibit 5, the nursing notes, the State asked that its copy be admitted without any markings. The defense then withdrew its Exhibit 2. The defense renewed its motions for mistrial and for

acquittal, which the court overruled.

**{¶80}** After deliberations, the jury found Robinson guilty of rape of a victim with a substantially impaired ability to consent (R.C. 2907.02(A)(1)(c)(B)) and sexual battery (R.C. 2907.03(A)(2)(B)). It found that Robinson was not guilty of rape by force (R.C. 2907.02(A)(2)(B)).

**{¶81}** Following a sentencing hearing, the trial court issued a judgment entry on August 2, 2010, sentencing Robinson to eight years for rape and five years for sexual battery. The court merged the rape and sexual battery counts for the purpose of sentencing, thus ordering these sentences to run concurrently, followed by a mandatory period of post-release control of five years. On that date, the court also issued a notice to Robinson regarding the terms of his post-release control. Furthermore, the court issued a judgment entry giving Robinson notice of the duty to register as a Tier III sex offender. Robinson had filed a renewed motion for judgment of acquittal and motion for a new trial, which were denied by the trial court.

### Sufficiency of the Evidence

**{¶82}** In his first of four assignments of error, Robinson asserts:

**{¶83}** "The State failed to prove beyond a reasonable doubt that Appellant Robinson knew or had reasonable cause to believe the victim was substantially impaired per R.C. 2907.02(A)(1)(C) rape, and R.C. 2907.03(A)(2) sexual battery, as a result Appellant Robinson was deprived of his right to due process under the Fourteenth Amendment to the United States Constitution. (Tr. Passim)."

**{¶84}** "Sufficiency of the evidence is the standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict." *State v. Smith* (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668. Thus, sufficiency is a test of adequacy. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith* at 113.

**{¶85}** A rape as defined by R.C. 2907.02(A)(1)(c) involves engaging in sexual

conduct with a non-spouse, when "[t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age."

**{¶86}** Sexual battery as defined by R.C. 2907.03(A)(2) involves engaging in sexual conduct with a non-spouse, when "[t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired."

**{¶87}** Because the term "substantially impaired" is not defined in the Ohio Revised Code, the term "must be given the meaning generally understood in common usage." *State v. Zeh* (1987), 31 Ohio St.3d 99, 103, 509 N.E.2d 414. In order to establish substantial impairment, the State must demonstrate "a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct. This is distinguishable from a general deficit in ability to cope, which condition might be inferred from or evidenced by a general intelligence or I.Q. report." *Id.* at 103-104. This court explained that "'[s]ubstantial impairment' need not be proven by expert medical testimony; it may be proven by the testimony of persons who have had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct." *State v. Hillock*, 7th Dist. No. 02-538-CA, 2002-Ohio-6897, at ¶21.

**{¶88}** Robinson asserts that the State presented evidence only to show D.K.'s state of intoxication when the police arrived on the scene after the sexual conduct and later at the hospital, not of her condition at the time of the sexual conduct. He also contends that the evidence does not prove that he knew or had reasonable cause to believe that D.K. was substantially impaired. He compares his case to *State v. Schmidt*, 8th Dist. No. 88772, 2007-Ohio-4439, where the Eighth District reversed a conviction for sexual battery because it held that there was insufficient evidence to prove that the defendant was aware that the alleged victim's ability to control her conduct was substantially impaired. *Id.* at ¶46. In *Schmidt*, the court explained that:

**{¶89}** "There is nothing in this record that would enable a trier of fact to

reasonably conclude that defendant was aware that JG was substantially impaired to the point that it affected her ability to control his or her conduct. While JG may very well have intended to stop short of engaging in vaginal intercourse with defendant and subjectively felt substantially impaired during her sexual activities, we cannot conclude that defendant knew of JG's condition beyond a reasonable doubt. While she testified that she said "no," she also testified that she repeatedly continued to engage in very intimate consensual sexual activity with defendant. She said nothing to defendant following the incident. And, the other person, who was present in the bathroom during the entire incident, did not hear any conflict between defendant and JG. The outward signs JG exhibited indicated that she was aware of her surroundings, was able to operate her vehicle, park it by the hotel, and walk and talk in a 'normal' fashion. While JG claims she might have been in and out of consciousness, there is no evidence that defendant noticed this. Further, JG had specific recall of all the events of that night, with the sole exception of the very moment defendant engaged in vaginal intercourse. Moments after the encounter with defendant, she described being able to employ a relatively elaborate plan to find her friend's whereabouts in the hotel. Then, she got back in her car and drove home without difficulty." *Id.*

**{¶90}** Here, the record contains sufficient evidence that D.K. was substantially impaired and that Robinson knew of her substantial impairment. D.K. testified that she took approximately three shots of 110 proof vodka in Robinson's presence and that she, Dorsey, and Robinson smoked marijuana together. Robinson acknowledged that they smoked marijuana multiple times that evening. He testified that he did not know how many shots of vodka D.K. took, but admitted that he, Dorsey, and D.K. finished a bottle of 110 proof vodka. Christy testified that she observed two males dragging a female into a residence located approximately 50 feet away from her own. She explained that the female appeared unconscious: her head was hanging and her feet were dragging on the ground. Robinson argues that Christy was unable to identify him as one of the two males. However, while Robinson maintained that D.K. was walking without any help from him, he admitted that he was one of the two males seen walking with her.

**{¶91}** The three officers who responded to Christy's call testified regarding D.K.'s condition, explaining that she was unconscious and made no movement despite efforts to

awaken her via yelling, shaking, and a sternum rub performed by the paramedics. Detective Lowman stated that D.K.'s eyes were starting to roll back in her head, and he believed she had urinated in her pants, which is a sign of severe impairment. Officer Karafa explained that of hundreds of cases of intoxication he has encountered, D.K. was among the two worst he had ever seen. Finally, Officer Johnson testified that D.K.'s skin was "very, very gray" and that she was foaming at the mouth. He concluded that it was the worst case of intoxication he had ever seen.

**{¶92}** Christy testified that she called the police about five minutes after observing the dragging incident. Police dispatch logs confirm that Christy called the police at 9:32 p.m. and Detective Lowman called for paramedics after discovering D.K. at 9:57 p.m., 25 minutes later. Thus, approximately 30 minutes elapsed between Christy observing Robinson drag D.K. into the house and the police discovering D.K. unconscious in the basement.

**{¶93}** Thus, Robinson's reliance on *Schmidt* is misplaced. The alleged victim in *Schmidt* exhibited signs that she was able to control her conduct, such as walking and talking normally, as well as operating a vehicle. The record here contains evidence that the sexual conduct occurred during a 30 minute period between the time Christy observed Robinson and another male drag an unconscious D.K. into the house and the time the officers discovered her unconscious in the basement. Robinson would know of D.K.'s substantial impairment based on the evidence that he dragged her into the house while she was not making any independent movement. This case is further distinguishable from *Schmidt* because here, D.K. did not remember the sexual conduct at all. Therefore, the record contains sufficient evidence that D.K.'s ability to consent and control her conduct was substantially impaired and that Robinson knew of her condition. Accordingly, this assignment of error is meritless.

### Manifest Weight

**{¶94}** In his second assignment of error, Robinson asserts:

**{¶95}** "Appellant Robinson's conviction for rape per R.C. 2907.02(A)(1)(C) and sexual battery R.C. 2907.03(A)(2) were against the manifest weight of the evidence because there was no substantial evidence upon which a trier of fact could reasonably conclude that the elements of rape and sexual battery were proven beyond a reasonable

doubt, violating Section Three, Article IV Ohio Constitution.  (Tr. Passim)."

**{¶96}**  When reviewing a judgment under a criminal manifest weight standard of review, "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, supra, at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

**{¶97}**  This court's discretionary power to reverse on manifest weight grounds and grant a new trial is exercised only in the exceptional case where the evidence weighs heavily against conviction.  *Thompkins* at 387.  This standard is a high one because the trier of fact was in a better position to determine credibility issues, by having personally viewed the demeanor, voice inflections and gestures of the witnesses.  *State v. Ali,* 154 Ohio App.3d 493, 2003-Ohio-5150, 797 N.E.2d 1019, at ¶36; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212.  A reviewing court therefore should not interfere with the witness credibility and factual determinations of the jury, unless the record demonstrates that a reasonable juror simply could not have found the witness to be credible.  *State v. Mock,* 187 Ohio App.3d 599, 2010-Ohio-2747, 933 N.E.2d 270, at ¶40.

**{¶98}**  Robinson argues that his conviction was against the manifest weight of the evidence because the State's evidence showed only that Robinson knew D.K. had been drinking, not that she was substantially impaired or that he knew or had reasonable cause to believe she was substantially impaired.  Specifically, he argues that due to his own intoxication, he lacked the ability to assess D.K.'s level of intoxication.  He also notes that he and D.K. presented conflicting testimony and asserts that D.K.'s testimony was not credible.

**{¶99}**  First, the State did present evidence of D.K.'s state of impairment at the time of the sexual conduct.  Robinson points to his own testimony that D.K. walked into the house on her own without his assistance before they went to the basement and had sex.  However, Robinson's testimony conflicts with Christy's testimony that the two males were dragging D.K. into the house and she was not making any movement.  Christy

testified that her house is located close to Kenst's house and the lighting was great and she had a pretty good view of everything. Detective Lowman estimated the distance between the two houses to be between 50 and 75 feet and confirmed that the area is fairly well lit. It was reasonable that the jury could have believed Christy's testimony and disbelieved Robinson. Christy did not know Robinson or D.K., and she explained that she had no ties to anyone involved with the case; whereas, Robinson's testimony was self-serving.

{¶100} Second, Robinson asserts that his testimony is more reasonable and questions D.K.'s credibility. It is true that Robinson and D.K.'s testimony conflicts in parts, such as whether D.K.'s son was in the vehicle when they smoked marijuana. Despite these inconsistencies and D.K.'s inability to remember the events of the night past a certain point, other witnesses such as the police officers and Christy, provided evidence of the events of the evening. Robinson also questions how D.K. could be raped in a house where Dorsey, her best friend, was present. However, evidence in the record shows that Dorsey was very intoxicated. Officer Johnson testified that Dorsey was foaming at the mouth and was taken to the hospital due to his level of intoxication. Even Robinson testified that right before he and D.K. went downstairs, Dorsey fell over in the kitchen and knocked over items. Despite Robinson's claims regarding his own credibility, his testimony conflicted with that of other witnesses. Notably, he testified that D.K. moaned in response to his attempts to awaken her in the basement; whereas, Detective Lowman and Officer Karafa similarly testified that D.K. did not respond to attempts to awaken her.

{¶101} Significantly, evidence in the record, including Robinson's own testimony, undercuts his claims that he was too intoxicated to assess D.K.'s level of impairment. Robinson described his level of intoxication as a "buzz." Robinson also testified that he followed D.K. down the stairs into the basement, apparently able to walk without any assistance. Furthermore, Detective Lowman testified that Robinson woke up in response to his verbal command and described Robinson as "a little bit – not alert probably due to his sleepiness but then later on did become alert enough that we were able to speak with him." Thus, the evidence does not reflect that Robinson was so intoxicated that he lacked the capacity to recognize D.K.'s state of impairment.

**{¶102}** Accordingly, this assignment of error is meritless. Robinson's convictions for rape and sexual battery are not against the manifest weight of the evidence.

### Allied-Offenses Sentencing Error

**{¶103}** Robinson asserts in his third assignment of error:

**{¶104}** "The trial court erred in sentencing Appellant Robinson separately for two crimes of similar import in violation of R.C. 2941.25, because rape R.C. 2907.02(A)(1)(C) and sexual battery R.C. 2907.03(A)(2) are allied offenses of similar import and were committed at the same time with the same animus. (Sentencing Tr.12, Sentencing Entry)."

**{¶105}** Robinson argues that the trial court committed plain error in sentencing him to concurrent terms of incarceration for his rape and sexual battery convictions since the trial court merged the two convictions. Thus, he argues that this court should vacate the sentences and remand the case for resentencing. The State concedes this error in its brief.

**{¶106}** Since Robinson did not object to his sentence at the hearing, he is correct that we must review for plain error. An appellate court does not have to resolve an alleged error if it was never brought to the attention of the trial court "at a time when such error could have been avoided or corrected by the trial court." *State v. Carter* (2000), 89 Ohio St.3d 593, 598, 734 N.E.2d 345. In the absence of objection, this court may only examine the court's actions for plain error. *Id.* "Plain error is one in which but for the error, the outcome of the trial would have been different." *State v. Hancock*, 7th Dist. No. 09-JE-30, 2010-Ohio-4854, at ¶55, citing *State v. Long* (1978), 53 Ohio St.2d 91, 97, 372 N.E.2d 804. The Ohio Supreme Court has recognized that the "imposition of multiple sentences for allied offenses of similar import is plain error." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, at ¶31, citing *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, at ¶96-102.

**{¶107}** R.C. 2941.25(A) provides: "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."

**{¶108}** Here, as the State admits, it conceded at the sentencing hearing that

Robinson's convictions for sexual battery and rape should merge for sentencing. The trial court found that the sentences merge, yet it sentenced Robinson on both offenses and ordered that they run concurrently. Since the trial court correctly found that the sentences merged, the issue is whether the trial court erred in imposing separate sentences for the offenses and ordering them to run concurrently.

**{¶109}** The Ohio Supreme Court has held that "[a] defendant may be indicted and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, at ¶17. Moreover, this court recently explained that "[s]entencing concurrently on merged counts does not satisfy the merger doctrine as no sentence at all should be entered on one of the two merged counts." *State v. Gardner*, 7th Dist. No. 10 MA 52, 2011-Ohio-2644, at ¶24, citing *Whitfield* at ¶17-18.

**{¶110}** Since the trial court correctly found that Robinson's convictions should merge, it erred by imposing concurrent sentences upon him. The *Whitfield* Court addressed the procedure appellate courts should follow when a trial court violated R.C. 2941.25(A): "Upon finding reversible error in the imposition of multiple punishments for allied offenses, a court of appeals must reverse the judgment of conviction and remand for a new sentencing hearing at which the state must elect which allied offense it will pursue against the defendant." *Id.* at paragraph two of the syllabus. See also *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, at ¶13.

**{¶111}** Accordingly, this assignment of error is meritorious. Robinson's concurrent sentences are reversed, and the case is remanded for a new sentencing hearing during which the State will elect to pursue either Robinson's rape or sexual battery conviction for sentencing purposes.

### Post-Release Control

**{¶112}** In his last assignment of error, Robinson asserts:

**{¶113}** "Appellant Robinson's sentence is void because the trial court failed to notify him during the sentencing hearing and in the sentencing entry that he could be subject to a prison term of up to one-half of the prison term originally imposed upon him for violating the conditions of his post release control in violation of R.C. 2929.19(B)(3)(e). (Sentencing Tr. p.13)."

{¶114} Robinson argues that while the trial court advised him he would be subject to post-release control, he was not advised of the consequences of a violation, contending that this matter should be remanded for resentencing pursuant to R.C. 2929.191. The State concedes this error in its brief.

{¶115} When reviewing a felony sentence, an appellate court first reviews the sentence to ensure that the sentencing court clearly and convincingly complied with the applicable laws. *State v. Kalish,* 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, at ¶4. A trial court's sentence would be contrary to law if, for example, it were outside the statutory range, in contravention to a statute, or decided pursuant to an unconstitutional statute. *Id.* at ¶15. An appellate court then reviews the trial court's sentencing decision for abuse of discretion. *Id.* at ¶17, 19-20. An abuse of discretion means more than an error of law or judgment; but rather implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.

{¶116} R.C. 2929.19(B)(3)(e) provides in pertinent part that:

{¶117} "[I]f the sentencing court determines at the sentencing hearing that a prison term is necessary or required, the court shall do all of the following:

{¶118} "(e) Notify the offender that, if a period of supervision is imposed following the offender's release from prison, * * * and if the offender violates that supervision or a condition of post-release control * * *, the parole board may impose a prison term, as part of the sentence, of up to one-half of the stated prison term originally imposed upon the offender. * * *"

{¶119} The Ohio Supreme Court has held that "[w]hen sentencing a felony offender to a term of imprisonment, a trial court is required to notify the offender at the sentencing hearing about postrelease control and is further required to incorporate that notice into its journal entry imposing sentence." *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, at paragraph one of the syllabus (superseded by statute on other grounds).

{¶120} The trial court told Robinson during the sentencing hearing that he would be subject to five years of post-release control, but did not inform him of the consequences of violating those terms. Furthermore, the sentencing entry only stated

that Robinson's term of imprisonment would be "followed by a mandatory period of post-release control of FIVE (5) YEARS to be monitored by the Adult Parole Authority. Defendant has been given notice under R.C. 2929.19(B)(3) and of appellate rights under R.C. 2953.08."

{¶121} While neither party discussed it in their brief, the record contains a notice form entitled "(Prison Imposed)" which explains that if Robinson violates a condition of his post-release control, he could be subject to a prison term of up to one-half of the prison term originally imposed. Robinson signed this form on the date of the sentencing hearing, under a line that read: "I, Aaron Robinson, hereby certify that the Court read to me, and gave me in writing, the Notice set forth herein." Robinson's counsel signed under a line that stated: "As the Attorney for the Defendant, I hereby Certify that the Judge read to the Defendant, and gave the Defendant in writing, the Notice set forth herein." Additionally, the State's counsel also signed this form.

{¶122} In a similar situation, the Tenth District recently held that where the trial court did not advise the defendant about post-release control during the sentencing hearing, but the defendant signed a "Prison Imposed" notice form on the date of the hearing, the use of this form was sufficient notice of post-release control and of the consequences of violating post-release control at the sentencing hearing. *State v. Easley*, 10th Dist. Nos. 10AP-505, 10AP-506, 2011-Ohio-2412, at ¶3, 14.

{¶123} Regardless of whether the trial court sufficiently notified Robinson of the sanctions for violating post-release control at the sentencing hearing, it failed to include this information in the sentencing entry. See *State v. Singleton*, 124 Ohio St.3d 173, 2009-Ohio-6434, 920 N.E.2d 958, at ¶11. See also *State v. Perkins*, 3d Dist Nos. 13-10-50, 13-10-51, 2011-Ohio-3129, at ¶21-22; *State v. Smith*, 9th Dist. Nos. 10CA0072-M, 10CA0073-M, 2011-Ohio-3109, at ¶7-8. This error in and of itself requires that the matter be remanded for resentencing.

{¶124} The parties correctly agree that Robinson's sentence must be remanded to the trial court pursuant to R.C. 2929.191. In *Singleton*, supra, the Ohio Supreme Court held that, "[f]or criminal sentences imposed on and after July 11, 2006, in which a trial court failed to properly impose postrelease control, trial courts shall apply the procedures set forth in R.C. 2929.191." *Id.* at paragraph two of the syllabus. It further explained that:

**{¶125}** "Effective July 11, 2006, R.C. 2929.191 establishes a procedure to remedy a sentence that fails to properly impose a term of postrelease control. It applies to offenders who have not yet been released from prison and who fall into at least one of three categories: those who did not receive notice at the sentencing hearing that they would be subject to postrelease control, those who did not receive notice that the parole board could impose a prison term for a violation of postrelease control, or those who did not have both of these statutorily mandated notices incorporated into their sentencing entries. R.C. 2929.191(A) and (B). For those offenders, R.C. 2929.191 provides that trial courts may, after conducting a hearing with notice to the offender, the prosecuting attorney, and the Department of Rehabilitation and Correction, correct an original judgment of conviction by placing on the journal of the court a nunc pro tunc entry that includes a statement that the offender will be supervised under R.C. 2967.28 after the offender leaves prison and that the parole board may impose a prison term of up to one-half of the stated prison term originally imposed if the offender violates postrelease control." *Id.* at ¶23.

**{¶126}** The Court also explained that "[t]he hearing contemplated by R.C. 2929.191(C) and the correction contemplated by R.C. 2929.191(A) and (B) pertain only to the flawed imposition of postrelease control. R.C. 2929.191 does not address the remainder of an offender's sentence." *Id.* at ¶24.

**{¶127}** Accordingly, Robinson's fourth assignment of error has merit. Because Robinson was sentenced on August 2, 2010 and is still serving his prison sentence, this matter is remanded to the trial court for resentencing pursuant to R.C. 2929.191 to address post-release control errors only.

**{¶128}** In conclusion, Robinson's arguments are meritless in part and meritorious in part. The State presented sufficient evidence that Robinson knew of D.K.'s substantial impairment. Robinson's convictions were not against the manifest weight of the evidence because it was reasonable for the jury to find Robinson's claims to not be credible and believe the testimony of other witnesses. However, since the trial court merged Robinson's offenses, it erred by imposing concurrent sentences upon him, and by failing to properly instruct Robinson on the consequences of violating the terms of his post-release control in the sentencing entry. Accordingly, Robinson's convictions are affirmed,

his sentence is reversed, and this cause is remanded to the trial court for a new sentencing hearing during which the State will elect which offense to pursue for sentencing purposes and for resentencing pursuant to R.C. 2929.191.

Donofrio, J., concurs.

Vukovich, J., concurs.