[Cite as *State v. Johnson*, 2014-Ohio-4253.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 12 MA 137 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| DESIREE JOHNSON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from Youngstown
Municipal Court, Case Nos.
11CRB942; 12CRB507; 12CRB508.

JUDGMENT: Convictions Affirmed. Reversed and
Remanded for Resentencing.

APPEARANCES:
For Plaintiff-Appellee: Attorney Martin Hume
City Law Director
26 S. Phelps Street
Youngstown, OH 44503

For Defendant-Appellant: Attorney Louis DeFabio
4822 Market Street, Suite 220
Youngstown, OH 44512

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated: September 25, 2014

[Cite as *State v. Johnson*, 2014-Ohio-4253.]
DeGenaro, P.J.

{¶1} Defendant-Appellant Desiree Johnson appeals the July 20, 2012 judgment of the Youngstown Municipal Court convicting her of two counts of assault, one count of obstructing official business and one count of resisting arrest and sentencing her accordingly. On appeal, Johnson argues that the trial court erred by overruling her motion to dismiss for vindictive prosecution and that certain comments made by the prosecutor during closing arguments constitute plain error. She also asserts that trial counsel was ineffective for failing to object during cross-examination and closing arguments and for failing to file a motion to dismiss on speedy trial grounds. Finally, she asserts that failure to merge several of her convictions constitutes plain error and further that her sentence was an abuse of discretion.

{¶2} While Johnson's merger argument is meritorious, her remaining assignments of error are meritless. Johnson's conviction for resisting arrest and one of the assault charges were allied offenses of similar import, and should have been merged for sentencing. However, a presumption of vindictive prosecution was not established; the prosecutor exercised his discretion to file misdemeanor assault charges against Johnson, which she was subject to from the outset. And while some of the prosecutor's questions during cross and comments during closing were improper, they did not rise to the level of plain error; it further follows that counsel was neither ineffective on that basis, nor for failing to file a speedy trial motion. Finally, Johnson's sentence for obstructing official business was not an abuse of discretion. Accordingly, the judgment of the trial court is affirmed in part and reversed in part; Johnson's convictions are affirmed, but the matter is remanded for resentencing.

## Facts and Procedural History

{¶3} On March 30, 2011, Johnson and her friend Doretha Weston were arrested following a traffic stop by two officers working undercover; Weston was the driver of the vehicle and Johnson the passenger. As a result of incidents relating to that stop, on March 31, 2011, Johnson was charged with two counts of assault on a peace officer, R.C. 2903.13(A) & (C)(5), and obstructing official business, R.C. 2921.31(A) & (B), all felonies; and misdemeanor resisting arrest, R.C. 2921.33(A).[1]

---

[1] Weston was charged with obstructing official business, R.C. 2921.31(A) & (B), a felony; resisting arrest

**{¶4}** On April 8, 2011, Johnson and Weston appeared in the Youngstown Municipal Court with counsel and waived their right to a preliminary hearing on the felony counts and consented to have their cases being bound over to the Mahoning County Grand Jury and the State agreed to dismiss the misdemeanor charges without prejudice. A review of the trial court docket reveals that, although a filing entitled Rule 11 Agreement was filed for both Johnson and Weston, the content suggests that they were mere dismissal entries. Both are standardized computer forms used by the trial court with fields for case specific information. It is noteworthy that neither filing contains the information typically found in a Rule 11 plea agreement, i.e., the original and amended charges, the original and amended pleas, the potential penalties for the original and amended charges, and the agreed or recommended sentence. There was very limited information.

**{¶5}** In Johnson's case, the only specific fields that were filled in were as follows: 1) "I <<DESIREE JOHNSON>> BEING BEFORE THIS COURT * * * " 2) "THE STATE OF OHIO MOVES TO DISMISS THE FOLLOWING: W/O PREJUDICE <<RESISTING ARREST>> ; and 3) the electronic signatures of Johnson, her attorney, the prosecutor, and "RULE 11 DISMISSED W/O PREJUDICE JUDGE MILICH." In Weston's case, only the second and third items were filled out identically to Johnson's, but for her and her counsel's electronic signature.

**{¶6}** On May 12, 2011, the grand jury declined to indict the felony charges; instead indicting both Johnson and Weston with misdemeanor obstructing official business, R.C. 2921.31, and returning the cases to the Youngstown Municipal Court. Johnson executed a speedy trial waiver and filed a jury demand.

**{¶7}** At some point during the proceedings, Johnson and Weston made an internal affairs complaint against the arresting officers and filed a section 1983 action against them in federal court alleging police brutality. Several investigations into the incident by law enforcement ensued. Additionally, Johnson and Weston filed a motion in their criminal prosecutions requesting an independent private investigator be commissioned, which the trial court granted.

---

R.C. 2921.33(A), and driving under suspension, Y.C.O. 335.07(A), both misdemeanors, and a turn signal violation, Y.C.O. 331.14.

**{¶8}** After the conclusion of multiple investigations, on March 15, 2012, the State re-filed three charges against Johnson; two counts of assault, R.C. 2903.13(A) and one count of resisting arrest, R.C. 2921.33(B), all misdemeanors, arising from the March 30, 2011 incident. The assault charges were identical to those the grand jury had refused to indict except for the fact the victims were not identified as peace officers in the complaints, thus making the charges misdemeanors rather than felonies.[2] Johnson executed a speedy trial waiver in these two cases.

**{¶9}** On May 25, 2012, Johnson and Weston filed a joint motion seeking to dismiss the new charges on the grounds of prosecutorial vindictiveness and/or a broken plea bargain. In their joint motion, counsel alleged that the March 15, 2012 charges were re-filed in retaliation for a §1983 federal civil rights suit filed by Johnson and Weston, which alleged police brutality based upon the arrests for the instant offenses. However, the motion contained typographical errors concerning the date that suit was filed, among other errors.

**{¶10}** At the hearing, testimony from Youngstown Police Department Lieutenant Brian Butler and City Law Director Anthony Farris revealed that a meeting was held with Butler, Farris, then City Prosecutor Jay Macejko and others from the City Prosecutor's Office to discuss the propriety of re-filing charges against the defendants.

**{¶11}** Butler testified that he oversees the internal affairs department and that an internal affairs complaint had been filed, was investigated, and the allegations were determined to be unfounded. At some point, Butler became aware the defendants had filed civil rights actions against the City, and had talked to individuals in the prosecutor's office about the issue. In addition, it was revealed during later testimony by Farris that Johnson had filed an earlier civil rights action against the city regarding police conduct toward her son. Butler's testimony concerning the civil suits did not differentiate well between these two lawsuits; it was more general in nature and did not specify the timing of the suits in relation to the meeting of city officials. Butler further testified that the decision to

---

[2] Charges were also re-filed against Weston, driving under suspension, Y.C.O. 335.072(A) and resisting arrest, R.C. 2921.33(B), both misdemeanors.

re-file charges was not a reaction to any civil lawsuit or to the fact that the defendants had filed a jury demand in their criminal cases. Instead, he "absolutely" believed there was probable cause to support the re-filed charges based upon his review of the case. He did not know why it took 10 months from the time the grand jury returned the misdemeanor charge to the time charges were re-filed.

{¶12} Farris testified that during the meeting among city officials, Macejko appeared reluctant to re-file the charges and was concerned doing so would "look bad." Farris explained that there were concerns that "Macejko might have some animosity towards [Lieutenant] Mercer," and that this animosity might have contributed to Macejko's resistance to re-filing the charges. "There was clearly some sort of conflict that was present that had led to the delay [in re-filing the charges.]" Farris said he had a discussion with Macejko about re-filing the charges, but did not order the prosecutor's office to do so; ultimately that decision was made by Macejko. Farris expressed his opinion that re-filing the charges was appropriate and consistent with established policy and that when he was a prosecutor and a charge was dismissed without prejudice it was done so with the understanding that the charges might be re-filed at a later date.

{¶13} Farris further testified that as law director he was aware that there was an earlier civil action filed by Johnson regarding police conduct towards her son, as well as the civil action filed regarding the Johnson and Weston arrest. Farris emphasized that the charges were not re-filed in retaliation to the defendants' jury demand or their civil lawsuits. He said that when he had the meeting with Macejko he was unaware that there was a settlement conference coming up for one of the federal civil cases. Finally, he affirmed that neither he, nor any prosecutor had a personal stake in the civil actions.

{¶14} Michael Gollings, Johnson's counsel, testified that his understanding of the agreement was that the misdemeanor charges had been dismissed without prejudice in exchange for the defendants waiving their right to a preliminary hearing on the felony counts. Gollings opined that it was unusual for charges to be re-filed after they had been dismissed in such a manner, but conceded that a dismissal without prejudice means the charges may be re-filed at a later date.

**{¶15}** On June 5, 2012, the trial court overruled the motion to dismiss, and a joint jury trial for Johnson and Weston commenced that day. The State filed a motion in limine asking the court to disallow evidence of any mention of any civil lawsuits filed by the defendants against the arresting officers and the City. In particular, the State did not want the defendants to testify or reference the earlier encounter, internal affairs complaint, and lawsuit involving Johnson's son Benji which was pending against the City prior to the March 30, 2011 incident. The trial court overruled the motion, determining that the evidence was admissible.

**{¶16}** The State first called Darlene Jones, a supervisor at the Ohio Bureau of Motor Vehicles, who testified that Weston's license was under suspension on the date of the incident, and authenticated the BMV record of the suspension. Jones testified that Weston knew her license was suspended at that time, because she signed a suspension notice form on February 23, 2009, which was admitted into evidence. Moreover, during her testimony later in the trial, Weston reluctantly acknowledged her signature, after first asserting that Jones was lying.

**{¶17}** Officer Patrick Mulligan testified that he and his partner Lieutenant Kevin Mercer were working undercover for the street crimes unit at the time of the incident, and not wearing uniforms or driving a marked police vehicle. After observing the vehicle turn without signaling, they followed the car for a short distance and then initiated a traffic stop. Mulligan identified Weston as the driver and Johnson as the passenger. Initially, Mulligan had contact with Johnson and Mercer with Weston. Mulligan asked Johnson for identification and she initially denied having it. Mulligan asked again, " 'Do you have identification on you at all?' " Johnson responded: "I don't have to give it to you." In the meantime, Mercer was talking to Weston, who told him she did not have identification. Mercer also asked Johnson for identification, apparently not realizing that Mulligan had already requested it. When Weston heard Mercer's inquiry to Johnson she became irate, saying " 'What do you need her I.D. for?' "

**{¶18}** Mulligan testified that Mercer then asked Weston to get out of the vehicle but she refused, grabbing onto the steering wheel, and then Mercer grabbed Weston's arm to extract her from the vehicle "and that's when she stated 'I know my rights, I am not getting

out,' and then she locked herself tighter around the wheel." Mercer then extracted Weston from the vehicle by pulling her out forcibly. Mulligan recounted that after Mercer pulled Weston out of the vehicle, Weston went to the ground and started flailing her arms for about 20 seconds to avoid being handcuffed. Mulligan, who had been dealing with Johnson, went to assist Mercer by placing the handcuffs on Weston. Mercer stood Weston up and walked her to the cruiser.

{¶19} Mulligan testified that when he returned to Johnson, who was still in the car, he saw she was making a call on her cell phone and he asked Johnson to get off of the phone; however, she refused. Mulligan explained that allowing people to talk on cell phones during traffic stops poses a safety risk for officers. Mulligan gave Johnson several opportunities to get off of the phone, but she continued to refuse. Johnson began screaming obscenities at Mulligan and he asked her to step out of the vehicle for the last time, but she refused. Mulligan then attempted to take the phone from Johnson, but in the process, his hand caught on her wig and knocked it off her head, along with the phone, into the backseat. According to Mulligan, this angered Johnson and she got out of the car and started swinging at him.

{¶20} Mulligan was limited in his ability to restrain Johnson, who weighed 315 pounds according to the ambulance report admitted into evidence, because "I had recently had a hernia surgery and I was out for one month. I returned to work on March 2nd. This event occurred on March 30th. I was not fighting with somebody over 100 pounds more than me risking injuring myself." Mulligan testified that Johnson struck him in the face two times, after which Mercer came over to break up the scuffle and assist, but Johnson continued to resist, punching both officers. They eventually got her to the ground by Mulligan extending his leg to trip her, while Mercer hit Johnson in the stomach with his knee to knock her down. Johnson continued to kick and punch while on the ground, and Mercer struck Johnson twice in the neck area with his fist to finally subdue her. Mulligan stated that Mercer used only the amount of force necessary to gain compliance, and that the level of force used was appropriate based upon his training and experience. At that point, Weston got out of the police vehicle to protest the officers' actions towards Johnson. While

Mercer went to detain Weston, Mulligan was able to place handcuffs on Johnson after he threatened to use a taser on her.

**{¶21}** Back-up officers arrived, one of whom got Johnson off of the ground and placed her in his cruiser. During an inventory search of Weston's vehicle identification cards for both women were found. A records search revealed that Weston was driving with a suspended license and Johnson had an outstanding warrant.

**{¶22}** Mulligan then identified photos that showed the parties following the incident. Joint Exhibit 3 shows the injury to Mercer's face from the struggle with Johnson, specifically there is a scratch mark on Mercer's right cheek, stretching from the top of his forehead to the jawline; blood is drawn on parts of the wound. Joint Exhibits 4 and 5 show Johnson after the struggle; Exhibit 5 shows that Johnson has a cut inside her lower lip; Exhibit 4 shows that the outside of her lower-left lip is swollen. She has no other visible injuries. Joint Exhibit 6 shows an abrasion to Mulligan's nose from being hit by Johnson. Mulligan testified that neither he nor Mercer had injuries to their faces before the incident with Johnson and Weston. Joint Exhibit 7 is a photograph of Weston that was taken after back-up had arrived, in which she is posing for the camera and smiling broadly, with no visible injuries.

**{¶23}** During the incident, one of the calls Johnson made was to 911, and the call was played for the jury. Mulligan identified Johnson's voice on the tape, and where he told her several times to get off of the phone and get out of the car. The tape was admitted into evidence in addition to being played for the jury, but it is missing from the record on appeal, and attempts by this court to locate it with the court reporter and counsel were unsuccessful. As it is the appellant's burden to provide a complete record for review, this court must presume the regularity of the proceedings. *See* App.R. 9(B); *State v. Dumas*, 7th Dist. No. 06 MA 36, 2008-Ohio-872, ¶14. Here this requires us to take as true Mulligan's testimony about the contents of the 911 call.

**{¶24}** Mercer was not called to testify. The State rested and Johnson and Weston made Crim.R. 29 motions for acquittal, which were overruled by the trial court. The defense presented the testimony of Johnson, Weston and Marietta Wilson, who lived nearby and witnessed part of the incident.

{¶25} Johnson testified that she was not feeling well that day and Weston took her to play the lottery at a store near the Pennsylvania border. They returned to Youngstown where they were followed by the undercover officers and subsequently pulled over. Johnson said she immediately recognized the officers as being involved in an earlier incident involving her son, Benji.

{¶26} According to Johnson, Weston asked why they were being pulled over, and Mercer explained she had failed to signal. She said Mercer told Weston to turn off the car and then "he reached in there [and] started ripping her out by her head," eventually getting her out of the car and slamming her to the ground multiple times. Johnson said she was scared and called her mother and 911 and put both phones on speakerphone.

{¶27} Johnson testified that Mulligan then asked her to get off of the phone and to get out of the car, and she finally agreed to do so, but then Mulligan opened the door and grabbed her by the hair, ripping her wig off in the process, forcibly pulling her out of the car and damaging the seat belt. At this point, both officers began to hit her; Mercer punched her in her mouth, causing it to bleed. Mercer continued to punch her while Mulligan hit her in the back, and she was kneed in the stomach several times, ultimately falling to the ground. Johnson claimed she never started swinging at the officers. After the incident, more officers and an ambulance arrived; Johnson testified that Mercer would not allow her to be taken to the hospital.

{¶28} Johnson further testified that in 2009, Mulligan, Mercer, and another officer were involved in an incident with her then twelve-year-old son. She explained that Mulligan had a gun pointed at her son's head and performed a search where Mercer "went down the crack of his butt to his groin and searched him." She said she attempted to open an internal affairs investigation against the officers; however, nothing came of it.

{¶29} On cross, Johnson agreed that the 911 recording made no mention of Weston being slammed to the ground and that there was no screaming in the background. Johnson was presented with the Rural Metro ambulance report—which she acknowledge she signed—stating that she refused to be taken to a hospital. She also admitted, without being asked, that she has driven without a license many times.

{¶30} Weston testified that she drove Johnson to get lottery tickets and then returned to Youngstown, and because Johnson was not feeling well, she planned to take Johnson to the hospital, but was driving home first to retrieve a magazine when she was pulled over. She had noticed a vehicle following her, and originally thought it was a taxi, not an unmarked police vehicle. She maintained that she properly used her turn signal, and was unaware of any issue with her driver's license on the date of the incident.

{¶31} Weston continued that when she pulled over, Mercer told her she failed to use her signal and asked for identification, and that she offered to provide other identification because she did not have her driver's license with her. Mercer then told her to turn off the car and get out, but before she could get out of the car, Mercer grabbed her by the arm and side of the head and pulled her from the car. Mercer then slammed her on the ground about seven times, causing her right cheek to hit the ground. On cross, she later conceded that her face did not bleed and the photograph of her after the incident revealed no marks.

{¶32} Weston further testified that Mercer then "slammed [her] on the top of his car and he started going down [her] pants searching [her];" that she was screaming to Johnson who was still in the car; and Mercer threw her into the police car. She then saw the officers "beating" Johnson and got out of the police car to protest the officers' treatment of Johnson. She did not see Johnson fighting back, but conceded she did not see the beginning of the struggle; she only started watching after Johnson was out of the car and on the ground. When Mercer saw her get out of the police vehicle, he responded by slamming her on the ground two more times and then kneed her in the back. She looked up to see Marietta Wilson standing at her front door observing the incident, and it appeared Wilson was attempting to record the event with her cell phone.

{¶33} Finally, Weston asserted that the photograph of her after the incident where she is smiling was not a happy picture but really a picture of her feeling humiliated and embarrassed.

{¶34} Marietta Wilson, who lived near to where the incident occurred, testified that she heard a commotion outside and opened her front door to see what was happening. She saw Mercer leading a handcuffed Weston to the police cruiser. Wilson heard

Mulligan politely ask Johnson to put down the phone and get out of the vehicle, and Johnson asking why she needed to get out, protesting that she had done nothing wrong. The passenger door then came open, although Wilson did not see how, and then she saw Mercer return, grab Johnson, and hit her one time in the stomach; the officers did not hit Johnson once she was on the ground.

{¶35} Wilson further testified she saw Weston come out of the cruiser and start yelling at the officers, protesting that Johnson was sick and not to treat her that way. In response, Mercer cursed at Weston and told her to get back in the cruiser. At that point, Wilson said she started trying to take pictures. She then saw Weston on the ground, but did not see how she got there, and then saw Mercer put Weston back in the cruiser and returned to Johnson, who was on the ground. During the incident she never saw either woman attempt to fight with the officers. Wilson also observed Johnson start to walk towards an ambulance, but officers turned her around and put her into a squad car.

{¶36} On cross, Wilson testified that she never saw Mercer body-slam Weston onto the cruiser, nor did she see him put his hands up Weston's shirt or down her pants, which contradicted Weston's testimony. In fact, she said she never saw any violence towards Weston; and that when Mercer escorted Weston back into the police car, he did so in a non-violent manner. She agreed that when initially asking Johnson to exit the car and put down her phone, Mulligan did so politely. Further, Wilson conceded she did not see the beginning of the incident between Johnson and Mulligan that led to Mercer punching Johnson, nor did she observe who opened the door, or how Johnson got out of the car. Wilson further testified on cross that Mulligan never struck Johnson, which contradicted Johnson's testimony; she agreed that Johnson was resisting arrest.

{¶37} A number of joint exhibits were admitted into evidence: Johnson's outstanding warrant; a recording of Johnson's 911 call; photographs of the defendants and the officers; and Weston's BMV record. In addition, admitted into evidence were: Johnson's Rural Metro ambulance report; several photographs of Johnson, one depicting the cut on her lip; and a photograph of Wilson's house showing her vantage point of the incident. During closing arguments there were no objections to anything said by the prosecutor.

{¶38} After considering all the evidence, the jury found Johnson guilty of two counts of assault, one against Mercer and one against Mulligan, obstructing official business and resisting arrest. Following a sentencing hearing, Johnson was sentenced to, inter alia, 30 days for obstructing official business, 120 days for each assault count, and 60 day for resisting arrest, to be served consecutively, for an aggregate jail term of 330 days, and granted a stay pending appeal.[3]

## Vindictive Prosecution

{¶39} Before we address the substance of this assignment of error, a glaring misstatement in the record must be clarified, which requires us to invoke the principle of judicial notice. Specifically, what date did Johnson and Weston file a civil rights action against the officers and the City relative to the re-filed charges? While the latter date is clear from the record, the former is not. And as has been noted above with respect to the missing 911 tape, the appellant is responsible for the record on appeal. And as will be discussed below, Johnson and Weston bear the burden of proof with respect to this claim.

{¶40} As noted above, the joint motion filed by Johnson and Weston with the trial court seeking to dismiss the new charges on the grounds of prosecutorial vindictiveness was replete with typographical errors, which were repeated on appeal. Johnson represents in her brief on appeal that "immediately prior to the charges being refiled, the Appellant had initiated a civil rights action against the officers and the City of Youngstown." Similarly, Weston's appellate brief asserts that "In the interim, Ms. Weston filed a suit for police brutality under the Civil Rights Act." However, the precise dates are unclear and even the State's briefs appear to contain multiple typographical errors regarding the dates.

{¶41} Thus, we invoke the principle of judicial notice. Evid.R. 201 Judicial notice of adjudicative facts, provides in pertinent part:

> (B) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready

---

[3] Weston was convicted of obstructing official business and driving under suspension. A mistrial was declared on the resisting arrest charge because the jury failed to reach a unanimous verdict. Weston was

determination by resort to sources whose accuracy cannot reasonably be questioned.

(C) When discretionary. A court may take judicial notice, whether requested or not.

**{¶42}** This rule has been interpreted by the Ohio Supreme Court as permitting a court to sua sponte take judicial notice of certain relevant facts. *Disciplinary Counsel v. Sargeant*, 118 Ohio St.3d 322, 2008-Ohio-2330, 889 N.E.2d 96, ¶22; *Pankey v. Court of Common Pleas*, 7th Dist. No. 11 MA 29, 2011-Ohio-4258 (taking judicial notice of docket entries of subsequent filings in a common pleas declaratory judgment action, which was the subject of a mandamus action before- the court of appeals). "A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.' " *State ex rel. Coles v. Granville,* 116 Ohio St.3d 231, 2007-Ohio-6057, 877 N.E.2d 968, ¶20 (internal citations omitted)

**{¶43}** The record reveals that the incident occurred on March 30, 2011; the original charges were filed on March 31, 2011; and the charges were re-filed on March 15, 2012. We take judicial notice from the following court docket entries: 1) the federal civil rights action was filed in the Mahoning County Court of Common Pleas on March 29, 2012, in a case styled *Desiree Johnson and Doretha Weston v. City of Youngstown, Ohio, et. al.,* Case No. 12 CV 956; 2) the defendants filed a notice of removal to federal court on May 8, 2012; and 3) the case was filed May 8, 2012 in the U.S. District Court for the Northern District of Ohio, Eastern Division under Case No. 4:2012 CV 01137.

**{¶44}** Thus, the §1983 action filed by Johnson and Weston against the City and the officers was filed two weeks *after* the charges were re-filed against them.

**{¶45}** In her first of four assignments of error, Johnson asserts:

**{¶46}** "The trial court erred in overruling the Appellant's motion to dismiss based on prosecutorial vindictiveness as Appellant raised a presumption of vindictiveness and the State failed to rebut that presumption."

sentenced to, inter alia, 30 days for obstructing official business and one day for driving under suspension.

{¶47} Johnson asserts that the State re-filed charges against her in retaliation for her filing a jury demand and a §1983 lawsuit, claiming the procedural history and sequence of events suggest a reasonable likelihood of vindictiveness; thus creating a presumption of vindictiveness which the State has failed to rebut. *See Thigpen v. Roberts*, 468 U.S. 27, 30, 104 S.Ct. 2916, 82 L.Ed.2d 23 (1984); *Blackledge v. Perry*, 417 U.S. 21, 27-28, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). Protection of criminal defendants from vindictive prosecution is rooted in the Due Process Clause. *See Thigpen; Blackledge*.

{¶48} Johnson does not include in this argument on appeal the impact of the litigation involving her son. And as the §1983 action arising out of this incident was filed after she was re-charged, Johnson's argument is limited to the effect of her jury demand on the State's decision to re-file the charges.

{¶49} Although there are no cases from the Ohio Supreme Court or this court discussing vindictive prosecution, the United States Supreme Court has held that where the State brings additional or more serious charges that subject a defendant to an increased punishment following the successful appeal of his conviction, a rebuttable presumption of vindictive prosecution attaches. *Thigpen; Blackledge.*

> To punish a person because he has done what the law plainly allows him to do is a due process violation "of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604. In a series of cases beginning with *North Carolina v. Pearce* [395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656] and culminating in *Bordenkircher v. Hayes*, the Court has recognized this basic—and itself uncontroversial—principle. For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right.

*United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982).

**{¶50}** However, the Supreme Court specifically declined to extend the presumption of vindictiveness to the pretrial context, *Goodwin* at 381, reasoning that "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct." *Goodwin*, 457 U.S. 368 at 382.

> In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins-and certainly by the time a conviction has been obtained-it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

> In addition, a defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor. Defense counsel routinely file pretrial motions[.] * * * It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.

*Goodwin* at 381.

**{¶51}** In situations where no presumption of vindictiveness arises, "the burden lies with the defendant to 'prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do.' " *State v. Wilson*, 47 Ohio App.3d 136, 140, 547 N.E.2d 1185 (8th Dist.1988)

citing *Goodwin*. In other words, in such situations, generally the defendant must put forth evidence of an actual vindictive motive by the prosecution. *Id.* In a later case the Eighth District elaborated:

> As long as a prosecutor has probable cause to believe that an accused committed an offense, the decision whether or not to prosecute and on what charges is completely within the prosecutor's discretion. Thus, in a pretrial setting, a prosecutor is free to seek indictment on whatever charges the evidence can support, and no presumption of vindictiveness will attach if the defendant was clearly subject to those charges at the outset. Consequently, a pretrial decision altering the charges is less likely to be improperly motivated than a change in the charges made after an initial trial.

(Footnote citations omitted). *State v. Semenchuk*, 122 Ohio App.3d 30, 38, 701 N.E.2d 19, 24 (8th Dist.1997), citing *Goodwin* and *Wilson*.

**{¶52}** The case cited by Johnson, *State v. Bradley*, 2d Dist. No. 06CA31, 2007-Ohio-6583, is distinguishable because it involved re-indictment following a successful appeal. Here, the charges were re-filed before trial commenced in these proceedings, and further, before the §1983 action based upon the instant offenses was filed. Thus, pursuant to *Goodwin*, no presumption of vindictiveness arises. Further, there is no evidence of a vindictive motive by the prosecutor. To the contrary, those involved in the decision to refile charges all denied that there was any connection between the defendants' exercise of a protected right and the re-filing of the charges, which at that point in time was Johnson's demand, and Johnson failed to meet her burden of proof and present evidence otherwise.

**{¶53}** Consistent with the reasoning in *Semenchuk*, from the outset Johnson was subject to not only assault on a peace officer charges but misdemeanor assault as well, as there was probable cause for both offenses. The same reasoning applies to the resisting arrest charge. From the outset, there was probable cause supporting the two

assault charges; that Johnson knowingly caused or attempted to cause physical harm to both men, an abrasion on Mulligan's nose and a scratch the length of Mercer's face. Similarly, there was probable cause for misdemeanor resisting arrest; by force, Johnson resisted arrest and was alleged to have caused physical harm to each officer.

{¶54} Thus, there can be no presumption of vindictiveness for the charges re-filled against Johnson on March 15, 2012 based upon her demand for a jury trial. Accordingly, the trial court properly overruled Johnson's motion to dismiss for vindictive prosecution, and Johnson's first assignment of error is meritless.

### Plain Error in Cross-Examination

{¶55} In her second assignment of error, Johnson asserts:

{¶56} "The trial court plainly erred by allowing the prosecutor to improperly cross examine the Appellant as to her prior traffic record and by allowing the prosecutor to engage in an inflammatory, emotional and prejudicial closing argument."

{¶57} Because Johnson raises two distinct issues in this assignment of error, we will turn first to the evidentiary issues, specifically the State's improper inquiry during cross-examination about her prior traffic convictions and contempt of court finding.

{¶58} Normally such evidentiary issues are reviewed for an abuse of discretion. But here there was no objection made at trial, so we review for plain error only. *See State v. Altman,* 7th Dist. No. 12 CO 42, 2013-Ohio-5883, ¶22; Crim.R. 52(B). Reversal based upon the plain error doctrine requires an obvious error that affected a defendant's substantial rights under exceptional circumstances . Crim.R. 52(B); *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). It cannot be utilized unless the outcome clearly would have been different if not for the error. *State v. Waddell,* 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996). Further, "plain error is a discretionary doctrine which may, but *need not*, be employed if warranted." (Emphasis sic.) *State v. Donald*, 7th Dist. No. 08 MA 154, 2009–Ohio–4638, ¶68.

{¶59} First, Johnson challenges the following, which took place during her cross-examination by the State, arguing that the testimony was improper pursuant to Evid.R. 404(B) and Evid.R. 609, substantive character evidence and for impeachment purposes, respectively:

Q. How many times would you say, about five times you have driven with a suspended license?

A. I don't know.

Q. I got your record. You think five times is right? I can show it to you.

A. It could be a little more.

Q. Okay. So you have driven many times without a license?

**{¶60}** The prosecutor then noted that Johnson had been in front of the Youngstown Municipal Court judges in the past for driving and engaged in a discussion with Johnson as to why she never obtained driving privileges. Later, the prosecutor asked Johnson, "So now you have one, two, three, four, five, six convictions for driving without a license?" The prosecutor also asked Johnson, "And you had probation violations and you have had issues where you didn't pay your fines and you have issues with courts when you were younger?" Further Johnson was asked, "Now other than keeping on driving when a [c]ourt tells you not to drive you have even been before [c]ourts for contempt of court?" The prosecutor concluded the line of cross-examination by asking, "And you have had probation violations and you have had issues where you didn't pay your fines and you have had issues with courts when you were younger?"

**{¶61}** With regard to character evidence Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

**{¶62}** Johnson argues that the State did not offer this evidence as permitted by the rule, but rather to show that Johnson had numerous prior traffic offenses and did not respect the law, courts or authority, and to show it was therefore more likely she committed the present offenses. The State counters that Johnson opened the door to the questioning insofar as it was precipitated by Johnson's own admission that she had a history of driving with a suspended license.

**{¶63}** Johnson testified she had been at her sister's house earlier in the day that she was arrested. The prosecutor later asked on cross where Johnson's sister lived and learned it was on Southern Boulevard in Youngstown. The prosecutor followed up by asking Johnson how far her house was from her sister's house:

A. Straight up Market Street you can hit her house.

Q. How many miles would you say? Could you drive it or do you walk it?

A. You could walk it or drive it.

Q. That day did you walk it or drive it?

A. I probably drove it, which I wasn't supposed to be driving. I probably drove it that day.

Q. Why shouldn't have you been driving?

A. Because my license are [sic] suspended.

Q. But you still drove that day?

A. Yeah. That's why I have been in trouble before. That's the only habit I got, driving with a suspended license.

**{¶64}** From there, the prosecutor launched into the line of questioning challenged by Johnson and quoted above, i.e., "How many times would you say, about five times you have driven with a suspended license?" etc. Placing the challenged line of questioning in context, Johnson did open the door to questioning about her prior record of driving with a suspended license. She admitted, without being asked, that she had a habit of driving with a suspended license. *See State v. Franklin*, 178 Ohio App.3d 460, 2008-Ohio-4811, 898 N.E.2d 990, ¶78 (7th Dist.) (defendant opened the door to questioning about his criminal record where he first admitted he had a prior robbery and murder conviction.)

**{¶65}** The questioning about Johnson's prior contempt citations is admissible to impeach or rebut her testimony that driving with a suspended license was her *only* habit. Pursuant to Evid.R 609, that evidence would not be allowed to attack her credibility generally, insofar as "Evid.R. 609 limits impeachment by using evidence of a prior crime to

(1) crimes punishable by death or imprisonment for more than one year or (2) crimes involving dishonesty or false statements, regardless of the punishment." *State v. Washington*, 7th Dist. No. 08-MA-5, 2009-Ohio-2893, ¶26.  However, testimony about her prior contempt citations was admissible to rebut or impeach her specific statement that driving with a suspended license was her *only* habit.  Evid.R. 404(A)(1).  *See, also, Washington* at ¶26: "[O]n cross examination, appellant testified that he was never in trouble with the law.  In making this statement, appellant brought his criminal past into play by testifying that he was a law-abiding citizen.  In doing so, he opened the door for the prosecution to impeach him by rebutting this evidence.  It did so by introducing evidence that appellant had in fact been convicted of numerous crimes."  Thus, admission of this testimony was not error, let alone plain error.

{¶66} Even assuming there was error in permitting the testimony above, it does not rise to the level of plain error.  In other words, but for the alleged errors, the outcome of trial would not have been any different.  There was ample evidence presented supporting Johnson's convictions for one count of obstructing official business, two counts of assault, and one count of resisting arrest.

{¶67} Mulligan testified that when he asked Johnson for identification she first said she did not have it.  Mulligan asked again, " 'Do you have identification on you at all?'" Johnson responded: "I don't have to give it to you."  After Mulligan went to assist Mercer with Weston, he returned to Johnson, who was making a call on her cell phone and Mulligan asked Johnson to get off of the phone; however, she refused.  Mulligan explained that allowing people to talk on cell phones during traffic stops poses a safety risk for officers.  Mulligan gave Johnson several more chances to get off of the phone, but she still refused.  The 911 call that Johnson made was played for the jury.  Mulligan identified Johnson's voice on the tape, and where he told her several times to get off of the phone and get out of the car. Johnson then began screaming obscenities at him.  Mulligan asked her to step out of the vehicle, but she refused.  Mulligan then attempted to take the phone from Johnson, but in the process, his hand caught on her wig and knocked it off her head, along with the phone, into the backseat.  This angered Johnson and she got out of the car and started swinging at him, striking Mulligan in the face two times before Mercer came

over to assist. Johnson continued to struggle, punching both the officers; eventually, they got her to the ground where she continued to kick and punch, and Mulligan was finally able to handcuff Johnson only after he threatened to use a taser on her. There was photographic evidence of injury to both officers, and Wilson, an eyewitness to the arrests, agreed that Johnson was resisting arrest.

{¶68} Johnson and Weston's allegations that they had been severely beaten by the officers without cause is contradicted by Mulligan's testimony, Wilson's testimony, Johnson's ambulance report indicating she refused treatment, and photographs of the two women after the incident showing no injury to Weston and very minimal injury, a cut lip, to Johnson.

{¶69} Thus, even assuming there were evidentiary errors, they do not rise to the level of plain error here. We cannot conclude that but for these alleged errors the outcome of the trial would have been different. Accordingly, the first part of Johnson's second assignment of error is meritless.

### Plain Error in Closing Arguments

{¶70} Next we turn to Johnson's arguments about prosecutorial misconduct during closing arguments; i.e., that certain comments were improper and prejudicial so as to require a new trial. As Johnson concedes, because she failed to object to the alleged prosecutorial misconduct, she waives all but plain error. *State v. Kelley*, 179 Ohio App.3d 666, 2008-Ohio-6598, 903 N.E.2d 365, ¶83, citing *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶126. Thus, to "reverse her conviction, this court must be persuaded that the prosecutor's statements were not only improper, but that [Johnson] would not have been convicted but for the improper comments." *Kelley* at ¶83, citing Crim.R. 52(B); *State v. Fears*, 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (1999).

{¶71} As this court has explained:

> Parties have wide latitude in their closing statements, particularly "latitude as to what the evidence has shown and what inferences can be drawn from the evidence." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 213. A prosecutor may state his opinion if it is

based on the evidence presented at trial. Id. A prosecutor may not state his personal belief regarding the credibility of a witness. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 117. However, a prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn. *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 116. A prosecutor may even point out a lack of credibility of a witness, if the record supports such a claim. *See State v. Powell*, 177 Ohio App.3d 825, 2008-Ohio-4171, 896 N.E.2d 212, at ¶ 45.

*State v. Wolff*, 7th Dist. No. 07 MA 166, 2009-Ohio-7085, ¶13.

**{¶72}** On the other hand, a prosecutor "may not make excessively emotional arguments tending to inflame the jury's sensibilities." *State v. Tibbetts*, 92 Ohio St.3d 146, 168, 749 N.E.2d 226 (2001). Prosecutors may not deliberately saturate trials with emotion and a conviction based solely on the inflammation of fears and passions, rather than proof of guilt. *State v. Keenan*, 66 Ohio St.3d 402, 409, 613 N.E.2d 203 (1993).

**{¶73}** Johnson points to several statements by the prosecutor that she alleges constitute prosecutorial misconduct. Johnson first takes issue with the prosecutor referencing her prior DUS convictions and familiarity with the municipal court judges, citing the following two statements:

> The first stipulation is Exhibit 1 that Desiree Johnson had a warrant for her arrest on March 30th, 2011 and you heard her, you heard her testify. She knows Judge Milich, she calls him Milich, she knows him by name. She knows Judge Kobly. She got ten days from Judge Kobly. She knows Judge Douglas because she knows the system in and out for violating driving under suspension, she knows. She has a warrant for her arrest, stipulated to.

**{¶74}** Later, the prosecutor stated to the jury:

> * * * It's a joke to them, this is a joke, this is a game. You saw how comfortable she was. This is a game. Oh, you know, Judge Kobly gave me

community service, I didn't do the community service. That's so funny. She gave me ten days. That's Desiree Johnson for you. She gave me ten days. It's all a joke. They don't care. I only drove five, six times under suspension. It's a joke. Oh, that warrant, that silly warrant, it's all a joke. She is laughing her head off, Doretha Weston, it's all a joke. Don't buy into this.

**{¶75}** Johnson opened the door to questioning about her prior DUS convictions. She did call Judge Milich "Milich" during her testimony, just one example of an attitude of disrespect for the law and the legal system Johnson demonstrated during the trial. Therefore, these comments were not improper.

**{¶76}** Johnson next asserts it was improper for the prosecutor to comment about what Mercer would have testified to:

> * * * You are going to go back in that jury room and you are going to wonder why didn't the State call Lieutenant Mercer. We have been here a very long time. I want to go home and the officer, Mulligan and Mercer would have testified to the same thing. No point in keeping you longer than we need to. You heard the testimony, the disputed testimony. If I called Lieutenant Mercer, he would have testified to virtually the same thing that officer Mulligan would have testified to.

**{¶77}** The State chose not to call Mercer as a witness. It is improper to comment on what witnesses would have said had they testified. *See, e.g., State v. Robinson*, 7th Dist. No. 05 JE 8, 2007-Ohio-3501, ¶77 (prosecutors may not allude to matters not supported by admissible evidence in their closing argument and commit misconduct when making such an argument to the jury).

**{¶78}** Johnson next challenges this statement by the prosecutor during rebuttal:

> * * * And now they're trying to tarnish these two officers and say they brutally beat them. The officers have children, the officers have to live, they have families. How embarrassing for them that these women are accusing

them of this. It's offensive. You heard Officer Mulligan say it's offensive. Can you imagine if your son was on the police force and he was doing his job and somebody jumps out of a car * * * Can you imagine if that was your son? He is doing his job. These officers are sons, they are fathers, they have families too. They want you to believe that. It's a joke to them, this is a joke, this is a game. * * *.)

**{¶79}** Johnson and Weston's defense strategy was to cast the arresting officers in a negative light and to argue that they used excessive force during the arrest. These comments by the prosecutor were a reasonable attempt to combat that defense strategy and therefore not improper.

**{¶80}** Finally, Johnson challenges prosecutor's discussion of the defendants' federal civil rights case. During his initial closing statement, the prosecutor said:

[T]hey want you to find them not guilty and they indicated they want to sue the officers and that's what this is about. They want to be able to sue the City, make some money, that's what this is about, that's what this case is about.

**{¶81}** Later the prosecutor stated in rebuttal:

[I]f you find them not guilty they are going to sue these officers. They are going to win a big lawsuit. Of course, they are going to have this. They have the burden. They would want this stuff so they can win millions of dollars. They are banking on you to find them not guilty so they can win millions of dollars. They want you to buy their story. That's what this is all about. They want you to be that gullible. No doctor, no emergency room doctor, Rural Metro ain't (sic) going to give them what they want because nobody is going to give them fake evidence so they can lose their license. That's what they want you to do is say not guilty, ha-ha, the jury believed us, now we can show this and we are going to sue them and look at this we got

millions of dollars from the City of Youngstown.

**{¶82}** In essence, the prosecutor was suggesting to jurors that they had a civic duty to convict, which is improper. *See e.g., State v. Hopkins*, 7th Dist. No. 94 C.A. 103, 1996 WL 146099, *2 (Mar. 27, 1996) (concluding prosecutor's comments urging the jury to convict because it was their civic duty to reduce crime in the community were improper, but ultimately finding no prejudice.)

**{¶83}** However, the prosecutor's comments in this case that were improper do not rise to the level of plain error. We cannot conclude that but for the alleged errors, the outcome of trial would have been different. As explained in the evidentiary argument portion of this assignment of error, there was ample evidence presented supporting Johnson's convictions for two counts of assault, resisting arrest and obstructing official business. Accordingly, this argument under Johnson's second assignment of error is meritless.

### Ineffective Assistance of Counsel

**{¶84}** In her third assignment of error, Johnson asserts:

**{¶85}** "Appellant was denied the effective assistance of counsel when trial counsel failed to object to the prosecutor's improper cross-examination of Appellant, failed to object to numerous prejudicial portions of the prosecutor's closing argument and failed to seek dismissal of charges due to speedy trial violations."

**{¶86}** To establish ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. The defendant bears the burden of proving counsel's alleged ineffectiveness, since Ohio law presumes a licensed attorney is competent. *State v.*

*Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). If a defendant cannot show how counsel's errors undermined the reliability of the court's decision, there is no basis for finding that his right to counsel has been violated. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶109; *Strickland* at 693.

### Failure to Object during Cross-Examination and Closing Arguments

{¶87} Johnson alleges that trial counsel was ineffective in two main ways; each will be discussed in turn. First, she asserts that counsel failed to object when the prosecutor asked her about her prior driving under suspension convictions during cross-examination. As analyzed in the context of Johnson's second assignment of error, the testimony was not erroneously admitted, let alone does it constitute plain error. With regard to the prosecutor's statements during closing arguments, again, as discussed in Johnson's previous assignment of error, while some comments were improper, the failure to object did not prejudice Johnson. There was ample evidence to support Johnson's conviction, as borne out by her failure to assert her convictions were supported by insufficient evidence or against the weight of the evidence. Based upon the record before us, we cannot say that the outcome of the trial would have been different had counsel objected and the four improper statements made by the prosecutor during closing arguments were stricken. Accordingly, Johnson's arguments that counsel was ineffective for these reasons are meritless.

### Failure to Seek Dismissal on Speedy Trial Grounds

{¶88} Johnson next asserts that trial counsel was ineffective for failing to seek dismissal on speedy trial grounds with respect to the misdemeanor resisting arrest and assault charges, which were filed against her on March 15, 2012 for the incident which occurred the year before.[4] Ordinarily a speedy trial violation must be raised in the trial court or it is waived on appeal. *State v. Green*, 7th Dist. No. 01 CA 54, 2003-Ohio-3074, ¶8. However, it may be raised in the context of an ineffective assistance of counsel claim. In these circumstances, an appellate court reviews the issue "not to determine whether [the appellant] must be discharged because he did not receive a trial within the time frame

---

[4] Johnson does not allege a speedy trial violation with respect to the misdemeanor obstructing charge, conceding that she executed a speedy trial waiver.

contemplated by the Constitution of the United States and State of Ohio, but rather to determine whether [the appellant] should receive a new trial because he did not receive effective assistance of legal counsel." *Id.* at ¶9.

**{¶89}** As an initial matter, Johnson is correct that the July 19, 2011 time waiver she executed for the misdemeanor obstructing charge does not apply to the charges filed against her in March of 2012. In *State v. Adams*, 43 Ohio St.3d 67, 68, 538 N.E.2d 1025, the court held that: "[w]hen an accused waives the right to a speedy trial as to an initial charge, this waiver is not applicable to additional charges arising from the same set of circumstances that are brought subsequent to the execution of the waiver." *Id.* at syllabus.

**{¶90}** The speedy trial clock for the 2012 misdemeanor assault and resisting arrest charges began to run when the summons from the misdemeanor obstructing offense returned by the grand jury was served on Johnson, despite the complex procedural history of this case. In *Adams, supra*, the Ohio Supreme Court stated that " '* * * [W]hen new and additional charges arise from the same facts as did the original charge and the state knew of such facts at the time of the initial indictment, the time within which trial is to begin on the additional charge is subject to the same statutory limitations period that is applied to the original charge.' " *State v. Adams*, 43 Ohio St.3d 67, 68, 538 N.E.2d 1025, 1027 (1989), quoting *State v. Clay*, 9 Ohio App.3d 216, 218, 459 N.E.2d 609 (1983).

**{¶91}** Here there is no dispute that all charges arose from the same facts, the incident on March 30, 2011. Thus, we turn to the statute of limitations period applicable to the original charge.

**{¶92}** Johnson was originally charged on March 31, 2011, with two counts of assaulting a peace officer and one count of obstructing official business, all felonies, and one count of misdemeanor resisting arrest. In consideration for her waiver of a preliminary hearing on the felonies and her agreement to be bound over the grand jury, the misdemeanor resisting arrest charge was dismissed without prejudice. Johnson had been arrested on those charges on March 30, 2011, and released on bond. The grand jury declined to indict the felonies, returning an indictment for one count of misdemeanor obstructing official business on May 12, 2011, and the case was returned to the Youngstown Municipal Court.

**{¶93}**  When a person charged with a felony is bound over and subsequently indicted for a misdemeanor, the speedy trial time begins to run on the date that the summons is served on the defendant for the misdemeanor offense.  *See State v. Clark*, 11th Dist. No. 2007-L-139, 2008-Ohio-2760, ¶30; *State v. Phillips* (1984), 19 Ohio App.3d 85, 482 N.E.2d 1337 (1984), at syllabus.  As the court in *Clark* explained:

It is well-settled that, "[w]hen an original charge is later reduced to a lesser offense based upon the same conduct, the speedy trial limitations of R.C. 2945.71 begin to run anew on the date the defendant is served with the charge on the lesser offense." *State v. Smith* (Jan. 12, 2000), 4th Dist. No. 99CA31, 2000 Ohio App. LEXIS 89, at *4, 2000 WL 41723, citing *State v. Cattee* (1983), 14 Ohio App.3d 239, 242, 470 N.E.2d 421, and *State v. Besimer* (Feb. 28, 1996), 4th Dist. No. 95CA2110, 1996 Ohio App. LEXIS 825, 1996 WL 87461, at *6; see also ("The date from which the speedy trial provisions of R.C. 2945.71 begin to run for an accused whose original felony charge has been reduced to a misdemeanor is the date the summons was served for the lesser offense."); *State v. Wantz* (Sept. 18, 1992), 11th Dist. No. 92-A-1697, 1992 Ohio App. LEXIS 4805, 1992 WL 348156, at *2. However, "the additional number of days that the State receives to try the defendant for the lesser charge cannot exceed the date of the speedy trial deadline of the original charge" thus, the new speedy trial deadline must be "computed by comparing the deadlines for the original and reduced charges and using the earlier of the two deadlines." *Besimer*, 1996 Ohio App. LEXIS 825, 1996 WL 87461, at *7 (citation omitted).

*Clark* at ¶30.

**{¶94}**  Here the docket reveals the summons to appear at an arraignment set for May 24, 2011 on the misdemeanor obstructing charge was sent by certified mail to Johnson on May 17, 2011, but returned as: "return to sender, refused, unable to forward." Nonetheless, Johnson appeared at her arraignment on May 24, 2011 and bond was

continued. Since certified mail service of the summons failed, the date of the arraignment is used as the date the speedy trial time began to run for the charge returned by the grand jury and the three misdemeanors that were re-filed on March 15, 2012, resisting arrest and two counts of assault.

**{¶95}** Pursuant to R.C. 2945.71(B)(2), a person charged with a misdemeanor of the first or second degree shall be brought to trial within 90 days after the person's arrest or the service of summons.

**{¶96}** Johnson did execute a speedy trial waiver with respect to the three re-filed misdemeanor charges on April 25, 2012, and she was tried on all four charges on June 5, 2012. However, by the time she executed the time waiver, 337 days had run on her speedy trial time, clearly more than the 90 days allotted under R.C. 2945.71(B)(2). Assuming there were no tolling events, Johnson's speedy trial time would have expired on August 22, 2011.

**{¶97}** As an initial matter, any tolling events that occurred with respect to the original charge returned by the grand jury also apply to the March 2012 re-filed charges. "In calculating the time within which a criminal defendant must be brought to trial under R.C. 2945.71, periods of delay resulting from motions filed by the defendant in a previous case also apply in a subsequent case in which there are different charges based on the same underlying facts and circumstances of the previous case." *State v. Blackburn*, 118 Ohio St.3d 163, 2008-Ohio-1823, 887 N.E.2d 319, at syllabus.

**{¶98}** The speedy trial clock started to run on May 25, 2011, and continued for 20 days until Johnson filed a motion for discovery on June 14, 2011. This tolled the clock at least until the July 19, 2011 pretrial. A defendant's demand for discovery or a bill of particulars is a tolling event pursuant to R.C. 2945.72(E). *State v. Brown*, 98 Ohio St.3d 124, 127, 781 N.E.2d 159 (2002). This is because "discovery requests by a defendant divert the attention of prosecutors from preparing their case for trial, thus necessitating delay." *Id.* at 124. Thus, by the July 19, 2011 pretrial only 20 of the 90 days had elapsed.

**{¶99}** On July 19, 2011, Johnson requested the next pretrial be continued until September 7, 2011, and at that pretrial by the request of both parties, trial was reset for October 4, 2011. Joint motions for continuance toll a defendant's speedy trial time because

they can be attributed to both parties. *State v. Brown*, 7th Dist. No. 03-MA-32, 2005-Ohio-2939, ¶44. Thus, the speedy trial clock stood at 20 days.

**{¶100}** On October 4, 2011, the trial court granted Johnson's motion to continue trial, over the State's objection and reset the matter for trial on December 9, 2011. In the meantime, Johnson filed a jury demand on November 28, 2011 as well as a motion on November 21, 2011, requesting a private investigator at the State's expense, asserting that the investigation was necessary for her to prepare her defense for trial. As a result, the trial court converted the December 9, 2011 trial date to a motion hearing on the request for a private investigator, which the trial court granted, and trial was reset for January 13, 2012.

**{¶101}** The investigation was apparently not completed by January 13, 2012, and trial was continued to June 5, 2012. Johnson filed documentation indicating the investigation was complete on March 30, 2012 and the trial court approved the expense, ordering the State to pay. As all of these events were instigated by Johnson, the time is attributable to her, and the speedy trial clock was tolled through March 30, 2012.

**{¶102}** The misdemeanor charges were re-filed against Johnson on March 15, 2012, and by that date, only 20 days had run on Johnson's speedy trial clock. Johnson was arrested on the re-filed charges on March 20, 2012. The time for speedy trial begins to run when an accused is arrested; however, the actual day of the arrest is not counted. *State v. Canty*, 7th Dist. No. 08-MA-156, 2009-Ohio-6161, ¶80. Therefore the clock on the newly filed charges would have begun to run the day after her arrest, which was March 21, 2012.

**{¶103}** The clock continued to run until April 25, 2012, when Johnson requested a continuance, signed a time waiver as to the new charges, and asked that the case be set for a jury trial along with the original charge that had been returned from the grand jury. 35 days had elapsed between March 21, 2012 and the April 25, 2012. That 35 day period in conjunction with the original 20 day period, adds up to 55 days out of the 90 allotted days. Thus, trial counsel was not ineffective for failing to file a speedy trial motion.

**{¶104}** Trial counsel was not ineffective for failing to object to the State's questioning during cross with respect to Johnson's prior traffic convictions and contempt findings as that testimony was admissible. Nor was counsel ineffective for failing to object

to four statements made by the prosecutor during closing arguments as the statements were either proper or did not rise to the level of plain error as their admission did not change the outcome of the case. Finally, there was no speedy trial violation. Accordingly, Johnson's third assignment of error is meritless.

**Sentencing**

{¶105} In her fourth and final assignment of error, Johnson asserts:

{¶106} "The trial court's sentence constituted an abuse of discretion and the trial court plainly erred in not considering allied offenses of similar import."

{¶107} As it is dispositive of this assignment of error, we will first address Johnson's argument that the trial court committed plain error by failing to consider whether any of Johnson's convictions merged for sentencing purposes. Allied offenses which require merger for sentencing purposes are statutorily defined as "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). "A defendant may be indicted and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses." *State v. Whitfield,* 124 Ohio St.3d 319, 2010–Ohio–2, 922 N.E.2d 182, ¶17. "Therefore, a trial court must merge the crimes into a single conviction and impose a sentence that is appropriate for the offense chosen for sentencing." *State v. Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶41–43. But where the defendant's conduct constitutes multiple offenses of dissimilar import, or results in multiple offenses of similar import committed separately or with a separate animus, the defendant may be convicted of each offense. R.C. 2941.25(B). "The [L]egislative Committee Comment to R.C. 2941.25 observes that '(t)he basic thrust of the section is to prevent 'shotgun' convictions' " *State v. Logan,* 60 Ohio St.2d 126, 131, 397 N.E.2d 1345, 1349 (1979).

{¶108} This district has adopted the plurality decision in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, which established a two-part test to determine whether offenses are allied offenses of similar import under R.C. 2941.25. *Id.* at ¶46–52. *State v. Freeman*, 7th Dist. No. 12 MA 112, 2014-Ohio-1013, ¶16. An appellate court must first determine "whether it is possible to commit one offense *and* commit the

other with the same conduct." (Emphasis sic.) *Johnson* at ¶48. It is not necessary that the same conduct would *always* result in the commission of both offenses; instead, the question is simply whether it is *possible* for both offenses to be committed with the same conduct. *Id.* "If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." *Id.* If so, it must then be determined "whether the offenses were committed separately, or if the defendant had separate animus for each offense[,]" and if either is true the offenses do not merge. *Freeman*, ¶18, citing *Johnson* at ¶51. "When deciding whether to merge multiple offenses at sentencing pursuant to R.C. 2941.25, a court must review the entire record, including arguments and information presented at the sentencing hearing, to determine whether the offenses were committed separately or with a separate animus." *Freeman* at ¶18, citing *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, syllabus.

{¶109} "An appellate court should apply a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶28. Although no merger argument was made during Johnson's sentencing, "imposition of multiple sentences for allied offenses of similar import is plain error." *State v. Underwood*, 124 Ohio St.3d 365, 2010–Ohio–1, 922 N.E.2d 923, ¶31.

{¶110} Johnson was convicted of obstructing official business. "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(A). She was also convicted of two counts of assault. "No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn." R.C. 2903.13(A). Finally, she was convicted of resisting arrest. "No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another person and, during the course of or as a result of the resistance or interference, cause physical harm to a law enforcement officer." R.C. 2921.33(B).

**{¶111}** Applying the *Johnson* two-part merger analysis, it is *possible* to commit all these offenses with the same conduct, meeting the first prong. *See Johnson* at ¶48. Thus, we must turn to the second prong and determine whether the offenses were committed separately or with a separate animus. *See Johnson* at ¶51.

**{¶112}** There is clear evidence of two separate assaults against Mulligan and Mercer. Both men were punched by Johnson after she was outside of the vehicle and each sustained a small injury to the face. Regarding the obstructing charge, there is clear evidence that that offense occurred prior to and separately from the two assaults. When Johnson was still in the car she refused to produce identification and refused to stop using her cell phone. Mulligan asked her twice for identification, the second time she responded: "I don't have to give it to you." Next, Johnson refused to stop talking on her cell phone, which poses a safety risk for officers during traffic stops. This evidence of disregarding instructions from an officer constitutes obstructing. Thus, the assaults do not merge with one another or with the obstructing charge.

**{¶113}** Further, the obstructing charge does not merge with the resisting arrest charge. Again, there is clear evidence that the two offenses were committed separately. The conduct resulting in the obstructing charge occurred when Johnson was still in the vehicle and refusing to comply with the officer's order to produce identification and stop using her cell phone. The conduct giving rise to the resisting arrest charge occurred after she was already outside of the vehicle and fighting with the officers.

**{¶114}** This leaves for consideration whether the resisting arrest charge merges with one of the assault charges. All of the conduct giving rise to these three charges took place after Johnson got out of the vehicle and was fighting with the two officers. Thus, they were not committed separately, and the resisting arrest and one assault charge necessarily had to be committed against the same victim. The remaining element to consider for merger purposes is whether these offenses were committed with a separate animus.

> * * * R.C. 2941.25(B), by its use of the term "animus" requires us to examine the defendant's mental state in determining whether two or more offenses may be chiseled from the same criminal conduct. In this sense, we

believe that the General Assembly intended the term "animus" to mean purpose or, more properly, immediate motive.

Like all mental states, animus is often difficult to prove directly, but must be inferred from the surrounding circumstances. * * * Where an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, A priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime.

*State v. Logan*, 60 Ohio St.2d 126,131, 397 N.E.2d 1345, (1979) (internal citations omitted).

**{¶115}** Mulligan testified that Johnson began screaming obscenities at him and he asked her to step out of the vehicle, but she refused. Mulligan then attempted to take Johnson's phone from her, but in the process, his hand caught on her wig and knocked it off her head, along with the phone, into the backseat. According to Mulligan, this angered Johnson and she got out of the car and started swinging at him, striking Mulligan in the face two times. After Mercer came over to assist, Johnson continued to punch the officers, and although they were eventually able to take Johnson to the ground, she continued to kick and punch; Mulligan was only finally able to handcuff Johnson after he threatened to use a taser. Mulligan sustained a small injury to his nose and Mercer sustained a minor scratch to the face.

**{¶116}** The record demonstrates that Johnson's resisting arrest and assault convictions were the result of conduct committed by a single act with a single state of mind. Inferred from the surrounding circumstances of the traffic stop, Johnson's immediate motive involved the commission of one offense—resisting arrest—but in the course of committing that crime she commit another—assault—and therefore possessing a single animus, and warranting merger of the resisting arrest conviction with one of the assault convictions. *See Logan.*

**{¶117}** We find support for this conclusion in two recent decisions from this district. In *State v. Agee*, 7th Dist. No. 12 MA 100, 2013-Ohio-5382, this court held the trial court

erred by failing to merge attempted murder and felonious assault where a series of shots were fired into a vehicle and one bullet hit the passenger-victim, several other bullets hit the vehicle and another bullet hit and killed the driver-victim, reasoning: "While the jury was permitted to return verdicts for both felonious assault and attempted murder as to Mrs. Repchic, the state had to thereafter elect which offense would proceed to sentencing, and the trial court could only sentence appellant on one of the offenses against Mrs. Repchic." *Id.* at ¶75.

**{¶118}** And similar to Johnson's claim the record demonstrates plain error with respect to merger, in *State v. Bickerstaff*, 7th Dist. No. 09 JE 33, 2011-Ohio-1345, this court held:

> The record reflects that Bickerstaff committed the offenses of aggravated murder and murder through the single act of shooting Longmire, and with the single state of mind. The trial court therefore committed plain error by failing to merge Bickerstaff's convictions for murder and aggravated murder. The State "retains the right to elect which allied offense to pursue on sentencing on a remand to the trial court after an appeal." *State v. Whitfield*, 124 Ohio St.3d 319, 2010–Ohio–2, 922 N.E.2d 182, at ¶ 21. This court must therefore remand the issue to the trial court for a de novo sentencing hearing during which the State may elect to pursue either Bickerstaff's murder or aggravated murder conviction.

*Id.* at ¶76.

**{¶119}** As we have held that it was plain error for the trial court to fail to merge the resisting arrest conviction with one of the assault convictions for sentencing, we must determine the appropriate remedy. Where an appellate court determines that the trial court violated R.C. 2941.25 by failing to merge allied offenses and impose multiple punishments for allied offenses, "a court of appeals must reverse the judgment of conviction and remand for a new sentencing hearing at which the state must elect which allied offense it will pursue against the defendant." *State v. Robinson*, 7th Dist. No. 10 MA 128, 2012-Ohio-1686,

¶110, quoting *Whitfield* at paragraph two of the syllabus. *See also State v. Wilson,* 129 Ohio St.3d 214, 2011–Ohio–2669, 951 N.E.2d 381, ¶13.

{¶120} Accordingly, Johnson's argument with respect to merger is meritorious, and the sentences the trial court imposed on Johnson's resisting arrest and two assault convictions are reversed, and the case is remanded for the trial court to merge the resisting arrest conviction with one of the assault convictions, afford the State the opportunity to select which of the merged offenses to proceed to sentencing under, and resentence Johnson on the merged offense and the remaining assault conviction.

{¶121} Turning to Johnson's second sentencing argument, she contends that the trial court abused its discretion by imposing "near maximum, consecutive sentences." In light of our conclusion that the resisting arrest conviction must be merged with one of the assault convictions, this argument is mostly moot. But because Johnson's obstructing conviction is not subject to merger, it is ripe for review.

{¶122} Misdemeanor sentences are subject to an abuse of discretion review. R.C. 2929.22(A); *State v. McColor*, 7th Dist. No. 11 MA 64, 2013-Ohio-1279, ¶14. An "[a]buse of discretion means an error in judgment involving a decision that is unreasonable based upon the record; that the appellate court merely may have reached a different result is not enough." *State v. Dixon*, 7th Dist. No. 10 MA 185, 2013-Ohio-2951, ¶21.

{¶123} R.C. 2922.22(B) lists factors that a trial court, after considering the purposes of misdemeanor sentencing, must consider in determining the appropriate sentence to issue. R.C. 2929.22(B)(1). As this court has explained: "None of the statutory criteria controls the trial court's discretion, and the court may consider other relevant factors, but the criteria must be used as a guide in exercising sentencing discretion. * * * Failure to consider these criteria constitutes an abuse of discretion, but when the sentence imposed is within the statutory limit, a reviewing court will presume that the trial judge followed the standards set forth in R.C. 2929.22 and 2929.12, absent a showing to the contrary." (Internal citations omitted.) *State v. DeSalvo*, 7th Dist. No. 04-MA-127, 2005-Ohio-3312, ¶14.

{¶124} This court presumes the trial court considered the required factors with respect to Johnson's obstructing sentence. Johnson has a criminal history which includes

disorderly conduct, failure to register dogs, housing code violations, and numerous driving under suspensions. Further, she did not demonstrate remorse for her crimes. She made comments during her trial testimony indicating her overall disrespect for the law, for example stating, "I can't say I broke the law because I didn't get caught, right? I didn't get caught that day." During sentencing when speaking in mitigation of sentencing she stated: "Well that's all. With this case I feel I don't understand, Your Honor, in this case a warrant fell out of the sky for no reason at all."

**{¶125}** The prosecutor should not have made the argument that Johnson was "getting a break" because she was not prosecuted for felony assault on a peace officer, particularly since the grand jury refused to indict her on those charges. However, the trial court was free to, and in fact presumed to disregard that comment, and there were additional reasons supporting the obstructing sentence.

**{¶126}** Although a remand is necessary for the trial court to merge the resisting arrest conviction with one of the assault convictions and impose sentences that are appropriate for the merged offense requested by the State and the remaining assault conviction, the trial court's sentence for the obstructing conviction is not otherwise erroneous or an abuse of discretion. Pursuant to *Wilson,* the portion of a defendant's sentence that was not reversed and remanded for merger consideration is not reconsidered at resentencing. *Wilson* at ¶14-15. Accordingly, Johnson's fourth assignment of error is meritorious in part.

### Conclusion

**{¶127}** All of Johnson's assignments of error except for her merger argument are meritless. Johnson's conviction for resisting arrest and one of the assault charges were allied offenses of similar import, and should have been merged for sentencing. However, a presumption of vindictive prosecution was not established; the prosecutor exercised his discretion to file misdemeanor assault charges against Johnson, which she was subject to from the outset. And while some of the prosecutor's questions during cross and comments during closing were improper, they did not rise to the level of plain error; it further follows that counsel was not ineffective on that basis, neither for failing to file a speedy trial motion. Finally, Johnson's sentence for obstructing official business was not an abuse of discretion.

**{¶128}** Accordingly, the judgment of the trial court is affirmed in part, reversed in part and remanded for resentencing. Specifically, Johnson's convictions and the sentence imposed for her conviction for obstructing official business is affirmed. Johnson's sentences for her two assault and resisting arrest convictions are reversed and remanded for the trial court to merge the resisting arrest conviction with one of the assault convictions and impose sentences that are appropriate for the merged offense requested by the State and the remaining assault conviction.

Donofrio, J., concurs.

Vukovich, J., concurs.